UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| | Case No.: SACR 14-00188-CJC |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | ORDER GRANTING IN SUBSTANTIAL PART DEFENDANT'S MOTION FOR DISCOVERY AND DENYING IN SUBSTANTIAL PART GOVERNMENT'S MOTIONS TO QUASH |
| MARK A. RETTENMAIER, | |
| Defendant. | |

## I. RELEVANT FACTUAL BACKGROUND

Defendant Mark A. Rettenmaier is currently charged with two counts of possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B),(b)(2).  (Dkt. 1.)  The

charges arise from the discovery of alleged child pornography on his computer.[1]  (Dkt. 152 at 2.)

Rettenmaier brought his computer to Best Buy in Mission Viejo, California, on November 1, 2011, because it would not boot.  (Dkt. 167 at 10; Dkt. 152 at 2; *see also* Dkt. 149 [hereinafter "Bates"] at 948.[2])  Best Buy subsequently discovered that the computer had a bad hard drive and told Rettenmaier on November 20, 2011, that data recovery services were needed if he wanted to retain any information on the hard drive.  (Bates 948 at 4.)  Rettenmaier authorized data recovery services, and Best Buy sent the hard drive to its Brooks, Kentucky facility (where Best Buy sends all hard drives for data recovery) two days later.  (Bates 852; Dkt. 90 Ex. A [hereinafter "Affidavit"] ¶ 18a.)

The hard drive arrived at Best Buy's Brooks, Kentucky facility on November 25, 2011, and an initial search was performed by a Best Buy employee at 9:00 p.m. on November 28, 2011, revealing that the "drive appears to have been restored, underlying data visible."  (Bates 853.)  Best Buy called Rettenmaier less than thirty minutes later; he authorized "Level 2" repair and identified "[p]ictures, excel files, quicken files, text and word documents" as the most important  files to recover.  (*Id.*)

On or about December 20, 2011, Best Buy technician John "Trey" Westphal observed what he deemed to be inappropriate content on the hard drive.  (Dkt. 152 at 4.)  His discovery occurred after the data recovery repair for images—"to determine that the repair was successful [Westphal] must access the files to verify that the files were recovered intact."  (Bates 823.)

---

[1] The Court assumes the parties' familiarity with the facts, which are mostly undisputed, and highlights only those most relevant to the instant motions in this Order.

[2] Docket Entry 149 lodges into the record various documents produced as evidence by the Government. For simplicity, they are referenced throughout this Order by their Bates numbers.

Best Buy policy is that "if a technician saw something questionable they would stop working immediately" and notify his or her supervisor.  (Bates 1127.)  Westphal did so and notified his supervisor, Justin Meade (who was also a cooperating human source ("CHS") for the FBI) of the inappropriate content he found.  (Dkt. 152 at 4–5).  In such situations, the technician shows the supervisor how to replicate and find what the technician found so that the supervisor can replicate that for the FBI.  (Bates 818.)  Then, "the hard drive would be locked up until the FBI came to look at it.  If the images were not child pornography or the Agents believed they were [borderline], the technician would get the hard drive back and continue to work on the client's request."  (Bates 1127; *see also* Bates 543; Bates 818.)

On January 5, 2012, Meade emailed Agent Tracey Riley, with Randall Ratliff (another Best Buy CHS) carbon copied, stating that "We have another one out of California we want you to take a look at, when can you swing by?"  (Bates 1040.)  The next day, January 6, 2012, Agent Riley visited Best Buy and reviewed the content.  (Dkt. 152 at 6.)  She immediately recognized the picture flagged by the technician "as one of several belonging to a series of images of the same girl, some of which depict child pornography, that has been identified . . . as the 'Jenny' series."  (Dkt. 152 at 7; *see also* Bates 835.)  The picture in question was "of a fully nude, white prepubescent female on her hands and knees on a bed, with a brown choker-type collar around her neck."  (Dkt. 152 at 7.)  Presumably in the form of thumbnails, Agent Riley also saw "partial images of genitalia of young girls" and states that "[i]t appeared there was a lot of [child pornography] as the tech didn't have to scroll, the window popped up with image after image of [child pornography] and child erotica/grooming images."  (Bates 765; Bates 835.)  Having recognized what she believed to be child pornography, Agent Riley seized the hard drive and returned with it to the FBI office.  (Dkt. 152 at 7.)

//

Once at the FBI office, a preliminary scan was performed using a program named OS Triage.  (Bates 1064, Bates 829.)  Former Agent Adam Keown performed the scan; such scans are standard practice when the FBI receives a hard drive from Best Buy.  (Dkt. 152 at 7; Bates 1064.)  OS Triage uses a set of search terms to identify known child pornography files on a digital device.[3]  (Bates 1063.)  The scan determined that the data on the hard drive was underlying;[4] since OS Triage does not carve[5] images from a hard drive's unallocated space, a scan would need to be performed with a forensic tool to view the flagged images on the hard drive.  (Bates 829.)

On January 18, 2012, Agent Riley emailed a summary of the case (a "lead") to Agents Cynthia Kayle and Michael Osborn [Kayle's supervisor] of the Los Angeles FBI. (Bates 828–30.)  The lead stated that Agent Riley "observed the images that the Best Buy . . . technician observed" and went on to describe the "Jenny image" found on Rettenmaier's hard drive.[6]  (Bates 829.)  In a follow up email the next day, Agent Riley stated that the "hard drive has to be carved with a forensic tool, you can't just 'plug and play' it to see the images."  (Dkt. 127 Ex. A.)

---

[3] The search terms are kept confidential by the FBI.  (Bates 1603 ("[I]f a subject knew what terms were utilized to identify child pornography files, the subject could easily rename the files so that they would not be readily identified as such when run through" OS Triage.).)

[4] Another description of "underlying data" is that the files are in "unallocated space."  "Unallocated space is space on a hard drive that contains deleted data, usually emptied from the operating system's trash or recycle bin folder, that cannot be seen or accessed by the user without the use of forensic software.  Such space is available to be written over to store new information.  Even if retrieved, all that can be known about a file in unallocated space (in addition to its contents) is that it once existed on the computer's hard drive. All other attributes—including when the file was created, accessed, or deleted by the user—cannot be recovered."  *United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2011).

[5] "'Carving' is the process of recovering files and fragments of files that have been deleted or have otherwise become inaccessible to the user, such as when file directory entries are corrupt or missing." (Dkt. 135 at 11 n.2.)  As shorthand, images in the unallocated space are often referred to as "carved images."

[6] When asked about the discrepancy between focusing on the "Jenny image" and then stating that "images" were observed, Agent Riley stated that "whenever she sends leads to other divisions, she cuts and pastes the verbiage from a previous [lead] . . . so she could have cut and pasted from a previous document that had referred to multiple images when drafting" the Rettenmaier lead.  (Dkt. 157 at 7.)

After receiving Agent Riley's email, Agent Kayle forwarded it to the other recipient, Agent Osborn, stating, "I know our [United States Attorney] won't charge on carved images so I called Paul [an investigator in the Orange County District Attorney's office]. He thinks this is enough to get a warrant for the residence to check for other digital devices. I'm going to . . . open the case[] and start writing a state warrant to hopefully serve late next week." (Dkt. 127 Ex. A; Dkt. 139 Ex. 7 at 1–2.) However, no state warrant was actually sought. (Dkt. 139 Ex. 7 at 2.)

On January 24, 2012, Agent Kayle spoke to Assistant United States Attorney for the Central District of California ("AUSA") Anne Gannon, who stated that she was willing to seek a federal search warrant for Rettenmaier's residence based on Agent Riley's descriptions of the images. (Bates 833.) Agent Kayle related this to Agent Riley, asking to speak to her so that Agent Kayle could adequately and appropriately describe the images in the warrant. (*Id.*) They spoke shortly thereafter, (Bates 835), and on January 30, 2012, Agent Kayle sent a draft of the affidavit used in the search warrant to AUSA Gannon, (Bates 1058).

On February 2, 2012, Agent Riley sent an email to Meade, Ratliff, and James Christophel (Meade and Ratliff's supervisor) stating "Guys, I need to come back down to your shop this Friday to re-review [Rettenmaier's hard drive] (sorry AUSAs in other parts of the country want more)." (Bates 1039.) Agent Riley visited the following day and produced four pages of notes from her visit. (Dkt. 167 at 5; *see* Dkt. 139 Ex. 11 (notes).) The third and fourth pages of notes memorialize her re-review of Rettenmaier's hard drive[7] and describe four images that are distinct from the "Jenny image" or the

---

[7] The first two pages of notes have a title "Rettenmaier/LA" which is crossed out and describe four complete images. (Dkt. 139 Ex. 11.) While Rettenmaier claims that the Government "does not even try to explain where the first two pages of these notes came from," (Dkt. 157 at 5 n.3), Agent Riley's email to Meade references two cases she wanted to re-review, (Bates 1039). Presumably, the notes are for the other case.

-5-

partial genitalia images she previously saw.  (*See* Dkt. 139 Ex. 11.)  Agent Kayle relied on those descriptions when drafting her affidavit.  (Dkt. 97 ¶¶ 5–6.)

Agent Kayle followed up with AUSA Gannon on February 8, 2012, regarding the search warrant affidavit.  (Bates 1102.)  The search warrants to search Rettenmaier's home and the hard drive were issued on February 10, 2012.  (Dkt. 152 at 12.)  Notably, the affidavits attached to the two search warrants did not include descriptions of those four images but rather were substantially equivalent to the statements in Agent Kayle's January 30, 2012, draft (describing Agent Riley's January 6, 2012, search and the "Jenny image").  (*Id.*; Affidavit ¶¶ 18b–18e.)

## II.  LEGAL STANDARDS

Rule 16 of the Federal Rules of Criminal Procedure ("Rule 16") establishes guidelines for pretrial production by the Government, as well as for reciprocal discovery by the defendant, of certain limited categories of material, including items "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  To establish an entitlement to discovery under Rule 16, "[a] defendant must make a threshold showing of materiality, which requires a presentation of facts which would tend to show that the Government is in possession of information helpful to the defense."  *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013) (internal quotation marks omitted.)  Materiality is "not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense."  *United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir. 1984) (internal quotation marks omitted).  "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense."  *United States v. Lucas*, No. 15-10103, 2016 WL 6595972, at *6 (9th Cir. Nov. 8, 2016).

Trial courts may quash subpoenas that seek irrelevant or cumulative testimony. *See United States v. Polizzi*, 801 F.2d 1543, 1551 (9th Cir. 1986) (affirming district court's quashal of subpoena in part on the grounds that the proposed testimony "would involve only collateral matters"); *United States v. Yazzie*, 139 F.3d 909 (9th Cir. 1998) (unpublished) ("The district court also properly excluded testimony of the witness in view of the marginal relevance of the proposed testimony and its cumulative nature."). A trial court may also quash a subpoena for testimony "if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(a), 17(c)(2); *Amsler v. United States*, 381 F.2d 37, 51 (9th Cir. 1967) ("[T]he court determined that to issue the subpoena would be an oppressive and unreasonable use of the process of the court. We conclude that there was no abuse of discretion on the part of the trial judge in quashing the subpoena."); *see also United States v. Calandra*, 414 U.S. 338, 346 n.4 (1974) (applying Federal Rule of Criminal Procedure 17(c)'s unreasonable or oppressive standard to testimonial subpoenas in the context of grand jury proceedings). What is unreasonable or oppressive under Rule 17 "depends on the context" of the proceeding. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299–300 (1991).

As for supoenas *duces tecum*, Federal Rule of Criminal Procedure 17(c) provides that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." A Rule 17(c) subpoena is "not intended to provide a means of discovery for criminal cases." *U.S. v. George*, 883 F.2d 1407, 1418 (9th Cir. 1989). A party may move to "quash or modify the subpoena if compliance would be unreasonable or oppressive," *United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1113 n.51 (9th Cir. 2008), "but not otherwise," *United States v. Nixon*, 418 U.S. 683, 698 (1974). Rule 17(c) requires a showing of "relevancy, admissibility, and specificity to support the issuance of a subpoena." *See United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984); *see also Nixon*, 418 U.S. at 700–01; *United States v. Mackey*, 647 F.2d 898, 901 (9th Cir. 1981) (holding that Rule 17(c) was not

intended to "allow a blind fishing expedition seeking unknown evidence").  It is up to the discretion of the trial court to determine whether a Rule 17(c) subpoena application has met the *Nixon* requirements.  *United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981).

## III.  ANALYSIS

Rettenmaier's motion for discovery and subpoenas that the Government asks the Court to quash are associated with his two pending suppression motions, one challenging the search warrant affidavit and the other arguing that Best Buy acts as an agent of the Government.[8]  (Dkts. 78, 80.)  The relevance and materiality of Rettenmaier's requests depend on the arguments in his suppression motions.  Accordingly, the Court will organize its analysis by suppression motion rather than by subpoena or individual.

### A.  Suppression Motion Challenging the Search Warrant Affidavit

Rettenmaier's first motion argues that "the searches of his home and computer . . . were done pursuant to a warrant that was obtained through a knowingly false affidavit." (Dkt. 127-1 at 3 (citing Dkt. 78).)  The magistrate, he argues, would not have issued the warrant had critical pieces of information been included or represented accurately.

*1.  The Image's Location in Unallocated Space.*  Rettenmaier's primary criticism is that the affidavit, instead of stating that the image was "on the unallocated space where it could not be accessed without using specialized tools," (*id.* at 5), stated that the image was found through Best Buy's "data recovery service," (Affidavit ¶ 18a).

---

[8] Rettenmaier filed a third suppression motion challenging the inclusion of his cell phone in the search, but in a recent filing he indicated his intention to withdraw that motion.  (Dkt. 157 at 2 n.2.)

That discrepancy is relevant, Rettenmaier argues, because the Ninth Circuit has held that, in the absence of additional evidence, the mere presence of a pornographic image in unallocated space of a hard drive is insufficient to demonstrate that the owner "accessed, enlarged, or manipulated" the image.  *United States v. Flyer*, 633 F.3d 911, 919 (9th Cir. 2011); *see also id.* at 918 ("[A]ll that can be known about a file in unallocated space (in addition to its contents) is that it once existed on the computer's hard drive.  All other attributes—including when the file was created, accessed, or deleted by the user—cannot be recovered."); *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007) (indicating that mere "unwitting receipt of e-mail containing contraband will not support probable cause").  In contrast to "unallocated," "carved," or "underlying," "the phrase 'data recovery' has no specific meaning.  Rather, it can refer to anything from searching an email's trash bin, to running searches on a hard drive and up to Best Buy's" specialized tools.  (Dkt. 157 at 9.)  Rettenmaier argues that Agent Kayle's omission of the image's location in unallocated space from the affidavit was intentional, given her email to Agent Osborn that she knew AUSA Gannon would not charge for carved images.  (Dkt. 127-1 at 6–7; *id.* Ex. A.)

To support his suppression motion, Rettenmaier seeks testimony from AUSA Gannon about whether she knew that the image was in unallocated space and about any policy of not charging based on carved images.  (Dkt. 135 Ex. 5; Dkt. 157 at 10–11.)  Rettenmaier also seeks Agent Osborn's testimony regarding Agent Kayle's email to him stating that AUSA Gannon would not charge based on carved images and any policy basis for her email.  (Dkt. 157 at 12–13.)  The Government argues that their testimony is irrelevant because the appropriate inquiry is whether Agent Kayle misled the magistrate, not what she told AUSA Gannon or Agent Osborn.[9]  (*See* Dkt. 135 at 12 ("[T]he

---

[9] The Government repeatedly attempts to transform the Court's analysis of Rettenmaier's request for discovery and subpoenas into an evaluation of the merits of his underlying suppression motions.  (*See, e.g.*, Dkt. 152 at 29 ("Whether [Agent] Kayle used the precise words 'unallocated space' or not is unimportant because the search warrant contained the relevant information.  Rather than speculate about

appropriate inquiry is what [Agent] Kayle told the magistrate, not what she told the AUSA.  A detailed examination of the information she provided the *AUSA* is a wild goose chase where the proper focus of the hunt would be whether the information she provided the *magistrate* was misleading."  (emphasis in original)); Dkt. 140 at 5 ("[T]he appropriate inquiry is what [Agent] Kayle told the magistrate, not an e-mail conversation with her supervisor that neither party remembers.").)  Their testimony, the Government argues, would also be cumulative of Agent Kayle's testimony.  (*See* Dkt. 135 at 12 ("[W]here the inquiry would focus on whether [Agent] Kayle was deliberate or misleading in the affidavits, the most appropriate form of inquiry would be questions to [Agent] Kayle, not to the AUSA.  The government has already disclosed that [Agent] Kayle does not believe she provided the [lead] to the AUSA . . . . Accordingly, the proposed testimony of the AUSA would be wholly cumulative of other testimony."); Dkt. 140 at 6 ("[T]he most appropriate form of inquiry would be questions to [Agent] Kayle, not to her supervisor who happened to receive an e-mail from her at the time.  The government has already disclosed the e-mail itself, and, if it were relevant to defendant's motion, defendant could ask [Agent] Kayle about the e-mail.  Indeed, the e-mail was written by [Agent] Kayle, not by [Agent] Osborn.").)

Contrary to the Government's argument, AUSA Gannon and Agent Osborn's testimony is neither irrelevant nor cumulative.  The presence or absence of a charging policy, AUSA Gannon's decision to pursue this case contrary to Agent Kayle's expectation, what Agent Kayle discussed with Agent Osborn regarding how to portray the evidence to AUSA Gannon, and how she actually did so are all relevant to Rettenmaier's argument that the affidavit intentionally omitted the image's location in

why defendant's files were inactive, [Agent] Kayle simply and accurately provided the facts as she knew them.").)  The Court, throughout this Order, limits its analysis to the Government's arguments that do not attempt to preempt consideration of the suppression motions.

unallocated space.[10]  The Court is also perplexed by the Government's claim that their testimony would be cumulative, given that Agent Kayle does not recall sending the email or the basis for her statement that the United States Attorney would not charge on carved images, (Dkt. 152 at 9 n.19), and has stated that she "does not have an independent recollection as to whether she specifically informed AUSA Anne Gannon that the data consisted of 'carved images,'" (Dkt. 140 Ex. 2 at 2).

In addition to testimony, Rettenmaier seeks discovery of all internal memoranda or other documentation by or to Agent Kayle which are the basis for her email to Agent Osborn or which related to the subject of the policy of the United States Attorney's Office regarding "carved" images.  (Dkt. 127 at 1.)  The Government argues that the "existence or nonexistence of a . . . policy against charging on carved images would not tend to prove one way or the other whether [Agent] Kayle deliberately omitted from her affidavit that the child pornography files on defendant's hard drive were in unallocated space because . . . the email itself already demonstrates that [Agent] Kayle appeared to believe . . . that the [AUSA] had such a policy."  (Dkt. 152 at 29.)  However, the presence and scope of any policy of not charging based on carved images is relevant and material to Rettenmaier's argument that Agent Kayle intentionally concealed from the magistrate that the image was in unallocated space.[11]  (*See* Dkt. 157 at 10–11, 12–13; Dkt. 167 at 7–8; Dkt. 127-1 at 6–7.)

---

[10] The Government states that Agent Osborn does not remember the email in question or any other conversations about Rettenmaier's case.  (Dkt. 140 at 6; July 28, 2016, Disc. Ltr. at 2.)  However, he has refused to be interviewed by the defense and the Government makes no claims as to his memory of policies regarding charging for carved images.  (July 18, 2016, Disc. Ltr. at 2.)  Similarly, AUSA Gannon has stated to the Government that Agent Kayle did not inform her that the images were carved.  (Sept. 15, 2016, Disc. Ltr. at 1.)  The Government has refused to ask AUSA Gannon other questions regarding carved images.  (*See* Dkt. 135 Ex. 6 (Sept. 20, 2016 Disc. Ltr.).)
[11] The Government's argument that Federal Rule of Criminal Procedure 16(a)(2) protects these documents is unavailing.  (*See* Dkt. 142 at 26.)  Rule 16(a)(2) protects documents "made . . . in connection with investigating or prosecuting the case."  Memoranda regarding charging decisions that pre-date Rettenmaier's case are not within Rule 16(a)(2)'s scope.

Through a subpoena *duces tecum*, Rettenmaier also demands that Agent Osborn produce (1) any and all handwritten notes or memoranda concerning policies of the United States Attorney's office on filing charges on child pornography located in the unallocated space of a suspect's computer and which need to be carved out with the use of special forensic tools; (2) any and all notes or memoranda of conversations with Agent Kayle on or about January 19, 2012, on the subject of United States Attorneys not charging on carved images of child pornography; (3) any and all notes or memoranda of telephone conversations or face-to-face meetings with Agent Kayle concerning a new case of child pornography located in the unallocated space of the suspect's computer; (4) any and all replies to Agent Kayle's email dated January 19, 2012, at 5:53 p.m.  (Dkt. 140-1 Ex. 1.)  The Government argues that Rettenmaier's subpoena improperly seeks pretrial discovery and his requests are not sufficiently specific.  (Dkt. 140 at 8–11.)

Rettenmaier's first request, for notes or memoranda regarding policies on charging for carved images, is duplicative with his motion for discovery which seeks the same material and is QUASHED.  (*See* Dkt. 127 at 1–2 (seeking documents "which relate to the subject of the policy of the United States Attorney's Office regarding 'carved' images").)  Rettenmaier's third request is not sufficiently specific, it is way overbroad, and it is unduly burdensome to comply with since it seeks documents relating to *any* case, involving *any* suspect, handled by Agents Kayle and Osborn at *any* time.  Therefore, Rettenmaier's third request is QUASHED.  His second and fourth requests, however, relate to documents from a particular date and replies to a particular email.  They are sufficiently specific and there is adequate evidentiary basis to believe that such documents exist.  The Government's motion to quash Rettenmaier's subpoena *duces tecum* as to his second and fourth requests is DENIED.

*2. The Two Warrantless Searches.*  Rettenmaier also asserts that the affidavit was false and misleading because it stated that "[o]ther than the limited review detailed above

[Agent Riley's January 6, 2012, visit to Best Buy], the United States has not attempted to [search Rettenmaier's property] by other means," (Affidavit ¶ 26j), when in truth two additional searches took place: Agent Keown's OS Triage search and Agent Riley's February 3, 2012, re-review visit to Best Buy, (Dkt. 127-1 at 7–11).  Rettenmaier argues that the fact that those two searches occurred, and their scope, is relevant to his challenge to the affidavit because such evidence further undermines the affidavit, demonstrates additional violations of his Fourth Amendment rights, and allows him to present a "honest and accurate account of what happened" in his suppression motion.  (*Id.* at 10–11; *see also id.* at 8.)

The basis for Rettenmaier's belief that Agent Keown performed a OS Triage search, and accordingly that there are search records that must be produced, is Agent Riley's lead to Agents Kayle and Osborn, which stated that "[o]nce back at the Louisville [FBI] office the hard drive was attached to a forensic write blocker [and] a scan was performed with a preview tool.  It was determined that the data on the hard drive is underlying, meaning that a scan needs to be done for formatted files using a forensic tool that carves jpg images. . . . [I]t is not possible to view images without using a forensic tool."  (Bates 829; *see also* Bates 826 ("The hard drive has to be carved with a forensic tool, you can't just 'plug and play' it to see the images.").)

The Government argues that while Agent Keown *attempted* to perform a search with OS Triage, he was unsuccessful because the drive was not recognized and thus there are no search records to produce.  (Dkt. 152 at 23–24.)  The Government relies on its interview with Agent Keown for that conclusion; he "advised that in this case, based on [Agent Riley's lead], it appeared that no folder was created because the hard drive was not recognized or identified as a drive."  (Bates 1605; *see also* Bates 1055 (Agent Keown stating that better verbiage should have been used by Agent Riley); Bates 1104; Bates 1605 ("If a digital device was not recognized, [Agent] Keown would disconnect the

device from his system, return the device to the [Case] Agent, and verbally let the Agent know that no evidence was found by OS Triage since the device was not recognized. [Agent] Keown . . . would not draft a report documenting the inability for OS Triage to identify a drive; it was up to the Case Agent to document the facts as he told them.".) Given that no search was performed, the Government argues that Rettenmaier "has not made a threshold showing that the government is in possession of the information he seeks"[12] and his request for the OS Triage search log and search terms should be denied as moot. (Dkt. 152 at 21–24.) For the same reason, Rettenmaier's subpoena for Agent Keown's testimony should be denied, the Government argues, because his "attempted preview . . . insofar as it yielded nothing, and had no effect on the affidavits, simply has no relevance" to Rettenmaier's suppression motions and is cumulative of Agent Riley's testimony that Agent Keown attempted to preview the hard drive. (Dkt. 136 at 5 ("The fact that the attempted preview took place, and that no images were viewed, are facts that defendant could elicit from [Agent] Riley, if they are otherwise relevant.").)

Simply stated, Rettenmaier need not take the Government's word that "a scan was performed" in Agent Riley's lead means a scan was attempted but was unsuccessful. Notably, the scan in question would have taken place *after* Best Buy had repaired the hard drive. (*See* Dkt. 167 at 6–7.) It is as plausible, if not more so, to conclude based on the evidence that, contrary to the affidavit, an OS Triage search was performed but did not return results because any questionable images were in unallocated space. Notably, data in unallocated space is *not* one of the reasons Agent Keown provides for why OS Triage would fail to recognize, identify, or scan a hard drive. (*See id.* at 1604–05 (citing corrupted data, operating system incompatibility, mechanical failure, or encryption as causes that preclude OS Triage scans).) Rettenmaier has the right to production of logs

---

[12] The Government also challenges Rettenmaier's characterization of OS Triage as involving search terms and creating logs that document searches. (Dkt. 152 at 22–23.) However, Rettenmaier's characterization matches that of the Government's. (*Compare* Dkt. 127-1 at 8 *with* Bates 1055 (Agent Keown's statement that OS Triage creates a log) *and* Bates 1603 (discussing OS Triage's search terms).)

of the OS Triage search, should they exist, to question Agent Keown about the search, and to the OS Triage search terms, as such evidence is material given the affidavit's contrary attestation that no additional searches were performed.

The basis for Rettenmaier's belief that there was a February 3, 2012, search of his hard drive at Best Buy is Agent Riley's notes dates February 3, 2012 and titled "Rettenmaier-LA." (Dkt. 127-1 at 8–10; Dkt. 139 Ex. 11.) Agent Riley initially denied that a search occurred on February 3, 2012, and denied that she had any notes from the case. (Dkt. 167 at 9.) However, once the February 2, 2012, email from Agent Riley to Meade, Ratliff, and Christophel was disclosed (stating "Guys, I need to come back down to your shop this Friday to re-review [Rettenmaier's hard drive] (sorry AUSAs in other parts of the country want more)" (Bates 1039)), Agent Riley discovered those notes in her "closed files" folder on December 16, 2015. (Dkt. 149 Discovery Letter [hereinafter "Disc. Ltr."] from Mar. 16, 2016, at 2–3; Dkt. 167 at 9; *see also* Dec. 17, 2015, Disc. Ltr. at 1.) Despite the fact that the notes describe four images all distinct from the "Jenny image" viewed on January 6, 2012, Agent Riley initially tied the notes to her January 6, 2012, visit. (Dkt. 167 at 9; *see also* May 10, 2016, Disc. Ltr. at 2 (Riley "stated that if she had gone back to Best Buy on February 3, 2012, she would not have asked to view any images that she had not been shown originally. She added that she would not have asked Best Buy employees to scroll down. Had [Agent] Riley gone back to Best Buy, it would have been for the limited purpose of getting more detailed descriptions of what she saw initially, and not to search for more images. She added that she would never have asked Best Buy to show her new images."); *cf.* Dkt. 139 at 4–5 (characterizing her statement as that "she knows she would not have reviewed any images not originally *found* by Westphal") (emphasis added)).) According to Rettenmaier, the Government only admitted that the February 3, 2012, search occurred and that Agent Riley's notes were from that search on November 14, 2016. (Dkt. 157 at 4 (referencing Dkt. 139 at 4).)

To support his argument regarding additional, warrantless searches, Rettenmaier's motion for discovery seeks production of all documents related to the February 3, 2012, re-review at Best Buy. (Dkt. 127 at 2.)  The Government argues that it "has been diligent in searching for and producing discoverable materials" related to the February 3, 2012, visit and that it "will continue to search for and produce discoverable material *if* it learns of facts to suggest such material exists." (Dkt. 152 at 24–25 (emphasis added).)  The Government interviewed Agent Riley, Meade, and Ratliff about the second visit and asked Agent Riley to conduct a search for records; none recalled the second visit, Agent Riley did not find notes beyond the two pages found previously, she does not recall seeing the images described in the notes, and she does not recall the basis for her statement that "AUSAs in other parts of the country want more." (Dkt. 140 Ex. 2 (Riley); Bates 1127 (Ratliff); Bates 1106 (Meade); May 10, 2016, Disc. Ltr. at 1–2; July 28, 2016, Disc. Ltr. at 1.)

The Court believes that the Government must make a diligent inquiry to confirm that no additional materials exist, given Agent Riley's belated discovery of notes describing images beyond the "Jenny image," her indication that she likely spoke to Agent Kayle about her visits to Best Buy, (Bates 761), and Agent Kayle's declaration that she relied on Agent Riley's February 3, 2012, notes when drafting the affidavit, (Dkt. 97 ¶¶ 5–6; *see also* Dec. 17, 2015, Disc. Ltr. (referencing notes from Agent Kayle memorializing Agent Riley's notes which Agent Kayle took "during the process of preparing" the affidavit)).  A diligent search must be completed for any materials related to the February 3, 2012, re-review at Best Buy, and any evidence discovered must be produced or a specific ground must be given to avoid production of specific materials.

*3. Other Affidavit Discrepancies.*  Rettenmaier's suppression motion also challenges the affidavit on a few other grounds.  First, he makes the argument that the "Jenny image" described in the affidavit, (Affidavit ¶ 18c), does not constitute child

pornography.  (Dkt. 78 at 15–17.)  Second, he challenges the affidavit's statement that "all the photos [Agent Riley saw on January 6, 2012,] depicted on the screen contained possible child pornography."  (*Id.* at 17–18; Affidavit ¶ 18b.)  To support those challenges, Rettenmaier seeks Agent Gannon's testimony regarding whether she saw the "Jenny image" prior to approving the search warrant and, if she had seen it, whether she would have categorized it as child pornography.  (Dkt. 157 at 11.)  For the same reasons discussed above regarding AUSA Gannon's testimony, the Government's arguments that it is irrelevant and cumulative are unavailing.  What AUSA Gannon saw, and what she would have thought about it had she seen it, are relevant to the significance of any omissions in the affidavit and there is no indication Agent Kayle remembers whether she showed AUSA Gannon the "Jenny image."

The Court also notes that Rettenmaier indicates that he will be challenging the affidavit on the grounds that it does not sufficiently tie the "Jenny image" to his home. (*See* Dkt. 167 at 3 ("[T]he Kayle affidavits do not even aver facts that tie the hard drive to Dr. Rettenmaier's home.  For example, the Kayle affidavits do not describe: [statements that the hard drive was from Rettenmaier's home; programs, files, or folders on the computer that would tie it to his home; and any evidence of who accessed the hard drive and where they did so.]").)  To that end, given that "[w]hether or not there was probable cause supporting the issuance of a search warrant is determined by the totality of the circumstances," *United States v. Jennen*, 596 F.3d 594, 598 (9th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)), the Court notes that the affidavit also erroneously states "[a]s Mark Rettenmaier submitted one internal hard drive for repair rather than the entire computer tower, it is likely there are additional hard drives, computers, or digital devices" at his home, (Affidavit ¶ 10).  (*Cf.* Bates 948 at 4 (indicating that Rettenmaier dropped off his entire computer tower); *see also, e.g.*, Dkt. 135 at 1 (Government brief stating "Defendant submitted his *computer* to a Best Buy") (emphasis added).)

-17-

## B.  Suppression Motion Regarding Best Buy as the Government's Agent

Rettenmaier's second suppression motion argues that "Best Buy's search of his computer for alleged child porn was done to assist law enforcement and was done with the government's knowledge."  (Dkt. 127-1 at 13.)  If Best Buy's data recovery team was acting as the Government's instrument or agent when they repaired and searched Rettenmaier's hard drive, he argues, the search would violate his Fourth Amendment rights and all evidence against him discovered as a result of that violation must be suppressed.  (*See id.*; *see United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) ("[U]nder the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible.") (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).)  "[T]wo critical factors in the 'instrument or agent' analysis are: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends."  *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982) (citing *United States v. Walther*, 652 F.2d 788, 791–91 (9th Cir. 1981)).

There are two main grounds for Rettenmaier's agency argument.  First, "it is clear that the FBI and Best Buy made sure that during the period from 2007 to the present, there was always at least one supervisor who was an active informant with the FBI." (Dkt. 127-1 at 12; *see also* Dkt. 167 at 11 ("The FBI appears to be able to access data at the [Best Buy] facility whenever they want, and apparently neither Best Buy nor the FBI bothers making a record of the access when it occurs.").)  Second, Rettenmaier argues that both the initial search of his hard drive which revealed underlying data (and the immediate subsequent call to him at night to authorize data recovery) and Westphal's search for images *after* repair was complete were unnecessary and demonstrate "that Best Buy is an agent in the [G]overnment's efforts to stamp out child pornography."  (Dkt.

167 at 12; Dkt. 126 at 13–15; *id.* at 15 ("Numerous, unnecessary searches of Dr. Rettenmaier's hard drive by a computer repair shop that is permeated with FBI informants suggests the searches were done with the FBI's acquiescence to help the FBI, rather than fixing the hard drive.").)

According to the FBI, Meade was a CHS for two periods of time—October 2008 to January 2009 and November 2009 to November 2012.  During the first CHS period, Meade worked with FBI Agent Richard T. Boswell.  (*See* Bates 1123; Dkt. 152 at 6.) Before the second CHS period, Agent Jennifer Cardwell took over for Agent Boswell[13] (Agent Riley took over for Agent Cardwell in July 2010 (Bates 1028)).  (Bates 1122–23.) Meade estimates that he contacted the FBI reporting child pornography approximately six to nine times per year.  (Bates 544–45.)  Though the FBI has had eight different CHS at Best Buy's Kentucky facility, at the time when Best Buy had Rettenmaier's hard drive, only Meade and Ratliff were connected to the FBI.  (Dkt. 152 at 6.)[14]  Both Ratliff and Meade received payment from the FBI; every CHS prior to February 2012 received payment.  (*Id.*; *see also* Bates 910–12.)

In June 2009, even though the Government claims Meade was not a CHS at the time, he emailed the FBI regarding a unit he wanted Agent Boswell to examine.  (Bates 1123; *see also* Bates 1124 & Bates 1121 (emails from Meade to FBI between January

---

[13] When the FBI contact person changed, Meade would forward the new contact information to Christophel and Ratliff.  (Bates 1028.)

[14] In interviews with the Government, Meade, Ratliff, and Westfall all disclaimed acting as Government agents or performing unnecessary searches in service of the Government's aims.  (Bates 544 ("Meade stated that he was never asked by any FBI agent or any other law enforcement agency to search for child pornography at any time.  Meade stated he never directed his subordinates to search for child pornography or any crime in order for him to make reports to law enforcement."); Bates 1127–28 ("Ratliff stated Best Buy employees did not look for certain things on people's devices. . . . Ratliff stated the FBI did not pay him to find evidence or child pornography. . . . Ratliff stated he never told or encouraged the technicians to search for evidence for the FBI."); Bates 818 ("Westphal stated he was not in any way, shape, or form, working as an agent of the FBI.  Law enforcement never asked Westphal to seek out information for them. . . . Westphal stated he was not a source for any law enforcement. Westphal was not paid by law enforcement.  Westphal did not recall contact with the FBI.").)

2009 and November 2009).)  On October 29, 2009, Agent Cardwell emailed Meade expressing interest in meeting "to discuss some other ideas for collaboration."  (Bates 1018.)  Rettenmaier seeks testimony and discovery to elucidate exactly what "ideas for collaboration" the FBI suggested to Meade, and more broadly the nature of the FBI/Best Buy relationship.  Specifically, he asks the Court to order production of (1) CHS files for individuals working with the FBI and employed at Best Buy's facility in Brooks, Kentucky from 2008 to February 2012, and all communications between FBI agents and them, (2) internal FBI memoranda or documentation regarding CHSs at Best Buy, (3) memoranda or documentation regarding training CHSs in detecting and locating child pornography, and (4) recruiting material from the FBI directed at Best Buy personnel. (Dkt. 127 at 2.)  Rettenmaier also has subpoenaed Agent Boswell to testify and subpoenaed Agent Cardwell and Ratliff to testify and produce documents.  (*See* Dkt. 139 Ex. 1.)

The Government argues that, because Agents Boswell and Cardwell were not Meade's point of contact at the time Rettenmaier's hard drive was under repair, their testimony is irrelevant.[15]  (Dkt. 139 at 8–10.)  However, Rettenmaier's argument regarding Best Buy acting as the Government's agent relies on two allegedly unnecessary searches.  (*See, e.g.*, Dkt. 157 at 14; Dkt. 167 at 10–11.)  Based on that, Rettenmaier argues that FBI desire to root out child pornography (and Meade's desire for payment) permeated Best Buy to the point of an agency relationship.  The testimony of Meade's FBI contacts is relevant because it will illuminate the *entirety* of the Meade-FBI relationship, which is central to the agency argument.

---

[15] The Government perplexingly states that Agent "Cardwell has no recollection of what 'collaboration' she was discussing in the [email to Meade], but can state with certainty that it was not to direct [Meade] to search for evidence on the FBI."  (July 28, 2016, Disc. Ltr. at 3.)

The Government argues that Ratliff's testimony would be irrelevant for essentially the same reason.  (*See* Dkt. 139 at 11 ("[I]t is hard to see how any testimony by Ratliff would be relevant here, except to undermine defendant's wholly unsupported speculation that individuals at [Best Buy] were operating at the behest of the FBI and searching customers' computers beyond what was required for repair.").)  Rettenmaier need not accept the Government's characterization of the Ratliff-FBI evidence as conclusive.  The Court cannot determine whether Rettenmaier's "unsupported" argument has merit as long as the Government refuses to produce the evidence that may support it; the Government's hope that the evidence will undermine Rettenmaier's motion does not exempt its production.

The Government's additional argument that Ratliff's testimony is irrelevant because the images viewed on February 3, 2012, do not appear in the search warrant affidavit is unavailing.  (Dkt. 139 at 11–12.)  Agent Riley has stated that Agent Kayle conferred with her regarding her Best Buy visits when drafting the affidavit, Agent Kayle has stated that she relied on Agent Riley's February 3, 2012, notes when drafting the affidavit, and Agent Riley's email to Ratliff and Meade scheduling the February 3, 2012, re-review makes clear that the re-review is based on Agent Kayle's request.  (*See* Bates 761; Dkt. 97 ¶¶ 5–6; Dec. 17, 2015, Disc. Ltr. at 1; Bates 1039.)  Ratliff's testimony about the February 3, 2012, re-review (along with his testimony about his relationship with the FBI writ large) is clearly relevant to Rettenmaier's suppression motions.

As for Rettenmaier's motion for discovery, the Government argues that information about Best Buy CHSs beyond Meade and Ratliff are immaterial because they were not active during the time Rettenmaier's hard drive was at Best Buy.  (Dkt. 152 at 30–33.)  However, the nature of the relationship between the FBI and Best Buy CHSs prior to Rettenmaier's hard drive's repair is relevant to how Meade understood his role as an informant and the possibility of an agency relationship between those who specified

Westphal's procedures and the Government.  Such information, for the two additional, paid CHSs who were active before February 2012, (*see* Dkt. 152 at 6), is material.

The Government argues that Rettenmaier's motion for disclosure of internal FBI records related to the use, training, and recruitment of Best Buy CHSs is moot because the Government already produced the source files for Meade and Ratliff and because Agent Riley and her current supervisor are unaware of any responsive documents.  (Dkt. 152 at 33–34.)  Rettenmaier need not rely on and accept the testimony of current FBI employees.  There is also no reason to believe internal FBI documents about Best Buy CHSs would be in Meade and Ratliff's source files.  The evidence produced thus far does not wholly disprove an agency relationship, and Rettenmaier should not be denied the opportunity to gather evidence to support his argument.

Finally, the Government asks the Court to quash Rettenmaier's subpoenas *duces tecum* for Agent Cardwell and Ratliff.  (Dkt. 139.)  Rettenmaier asks Agent Cardwell to produce all notes, memoranda, or other documentation relating to her "collaboration" email and Ratliff to produce all communications with the FBI and records concerning contacts with any FBI agent.  (*Id.* Ex. 1.)  The Government claims that his requests are insufficiently specific and seek irrelevant, inadmissible documents.[16]  (*Id.* at 16–18.) However, the nature of the FBI's "collaboration" with Meade is central to Rettenmaier's suppression motion and Ratliff was copied on emails informing the FBI about Rettenmaier's hard drive and scheduling Agent Riley's re-review.  (*See* Bates 1039–40.) Limiting the subpoena to one email for Agent Cardwell is sufficiently specific.  As for Ratliff, while Rettenmaier seeks a set of documents, given the limited, intermittent, and discrete scope of Ratliff's CHS relationship with the FBI, Rettenmaier's request is

---

[16] The Government states that Agent Cardwell "does not believe there would be any reports or notes concerning her contact" with Meade beyond what the Government has produced.  (July 28, 2016, Disc. Ltr. at 3.)  Notably, the Government does not state any basis for her opinion nor does the Government assure the Court that a diligent search was performed for such documentation.

sufficiently specific.  Rettenmaier also has given several plausible grounds under which such documents are admissible.  (*See* Dkt. 157 at 19–20 (potentially admissible as past recollections recorded, for impeachment, or to refresh recollection).)

## IV.  CONCLUSION

Rettenmaier's motion for discovery is GRANTED IN SUBSTANTIAL PART. The Government is ordered to produce:[17]

1.   All documents relating to the January 6, 2012, search of Rettenmaier's hard drive including, but not limited to, the OS Triage search log and search terms that were used;

2.   All internal memoranda or other documentation by or to Agent Kayle which are the basis for her statement in an email dated January 19, 2012, that the United States Attorney's Office will not charge on "carved" images (or, which related to the subject of the policy of the United States Attorney's Office regarding "carved" images.);

3.   All documents related to the search of Rettenmaier's hard drive at the Best Buy facility in Brooks, Kentucky that occurred on or about February 2, 2012;

4.   The Informant Files for the two FBI informants other than Ratliff and Meade who worked at Best Buy's facility in Brooks, Ketucky from 2008 to February 2012, and all documents reflecting communications between these

---

[17] The Court has altered Rettenmaier's proposed order slightly for clarity.  (*Cf.* Dkt. 127.)

FBI informants and FBI agents, including but not limited to emails, texts, and hand-written notes;

5.    All internal memoranda or other documentation between FBI personnel regarding the use of informants between 2008 and February 2012 at the Best Buy facility in Brooks, Kentucky;

6.    All internal memoranda or other documentation regarding FBI training of Best Buy personnel between 2008 and February 2012 in the detection and location of child pornography on computers brought to Best Buy for repair; and,

7.    All recruiting material from the FBI directed to Best Buy personnel between 2008 and February 2012.

The Government's motions to quash are DENIED IN SUBSTANTIAL PART. The Government's motion to quash the testimony of Agents Cardwell and Boswell is DENIED as their testimony is relevant to Meade's relationship with the FBI. The Government's motion to quash the testimony of Ratliff is DENIED as his testimony is relevant to the FBI/Best Buy relationship. The Government's motion to quash Agent Keown's testimony is DENIED as it is relevant to the OS Triage search. The Government's motions to quash Agent Osborn and AUSA Gannon's testimony is DENIED as their testimony is relevant to the affidavit's description of the image's location. The Government's motion to quash the subpoena *duces tecum* for Agent Osborn is GRANTED IN PART as Rettenmaier's first request is duplicative of his motion for discovery and his third request is insufficiently specific; it is DENIED IN PART as Rettenmaier's second and fourth requests are sufficiently specific. The Government's motions to quash the subpoena *duces tecum* as to Agent Cardwell is

DENIED as Rettenmaier's request is sufficiently specific.  Finally, the Government's motion to squash the subpoena *duces tecum* as to Ratliff is DENIED; the subpoena is MODIFIED to require the production of documents reflecting "All communications with the FBI in his capacity as a CHS at Best Buy and all other notes or other records concerning contacts with any FBI agent in his capacity as a CHS at Best Buy, including but not limited to documents, notes, memoranda, emails, texts, and letters."


DATED:     December 19, 2016

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE