James D. Riddet, Esq. (SBN 39826)
jriddet@bmkattorneys.com
Kenneth M. Miller, Esq. (SBN 151874)
kmiller@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701

Attorneys for Defendant
Mark A. Rettenmaier

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>MARK A. RETTENMAIER,<br><br>  Defendant. | Case No. SA CR 14-0188 CJC<br><br>POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY [Dockets 80, 88, 107] |

374153-1

## TABLE OF CONTENTS

I. Introduction ............................................................................................ 1

II. Overview ............................................................................................... 2

III. Analysis ................................................................................................. 3

    A. Best Buy, Acting Through GSC, Is a Government "Entity" ............... 3

    B. Best Buy, Acting Through GSC, Is a Government "Agent" ............... 5

        1. GSC and the FBI Worked Together to Investigate Child Pornography ........................................................................... 5

            a. GSC Chose to Work Closely With the FBI .................... 5

            b. The FBI Chose to Work Closely With GSC ................... 6

            c. The Best Buy/GSC Data Recovery System Was Designed to Find Child Pornography and Turn It Over to the FBI ...... 7

                (1) All Computers Received By Best Buy Stores Nationwide That Need Data Recovery Are Sent to GSC ................................................................. 7

                (2) The Vast Majority of Data Recoveries Involve Data Review for Images ......................................... 7

                (3) All Questionable Images Are Reviewed By a Paid FBI Informant ............................................... 7

        2. Justin Meade: Choke Point for all Alleged Child Porn Discovered at GSC and an FBI Informant ............................ 9

            a. Meade was "drafted" by the FBI (twice) ........................ 9

            b. Meade specifically agreed to help the FBI ..................... 9

i

TABLE OF CONTENTS AND TABLE OF AUTHORITIES TO POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY [Dockets 80, 88, 107]

        c. Meade was paid by the FBI (and falsely denied that payment under oath) ..............................................................10

        d. Meade was paid by the FBI in a *quid pro quo*—money for information ...................................................................11

        e. Meade's emails with the FBI leave no doubt that he was attempting to help the FBI ................................................11

        f. Meade's FBI handlers' conduct toward Meade demonstrates their understanding that they were working together to find child pornography ................................................................13

        g. Meade and other GSC informants were "tasked" by the FBI and sought the FBI's "guidance"..............................................................................13

    C. Meade Was a Government Agent, His Warrantless Search of the Hard Drive Exceeded Westphal's, and the Search Warrants Are the Fruit of His Illegal Search ..................................................................................14

        1. Meade Is a Government Agent (Even if All of GSC Is Not) ..........14

        2. Meade's Government Search Violated the Fourth Amendment Because It Far Exceeded Westphal's Search ...........................15

IV. Conclusion ................................................................................................16

TABLE OF CONTENTS AND TABLE OF AUTHORITIES TO POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY [Dockets 80, 88, 107]

# TABLE OF AUTHORITIES
**Cases:**

*Skinner v. Ry. Labor Execs' Ass'n,* 489 U.S. 602 (1989) ...........................5, 14

*Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518 (1819) ............3

*United States v. Ackerman,* 831 F.3d 1292 (10th Cir. 2016) ........................3, 5, 14

*United States v. Jacobsen,* 466 U.S. 109 (1984) ............................................14

*United States v. Johnson,* 806 F.3d 1323 (11th Cir. 2015) ...............................5

*United States v. Lichtenberger,* 786 F.3d 478 (6th Cir. 2015) ..........................5, 14

*United States v. Sherwin,* 539 F.2d 1 (9th Cir. 1976) (en banc) ...........................4

**Statutes:**

18 U.S.C. § 2252A ...........................................................................4

18 U.S.C. § 2252A(a)(5) ....................................................................3

373317-1

iii

TABLE OF CONTENTS AND TABLE OF AUTHORITIES TO POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY [Dockets 80, 88, 107]

## I. INTRODUCTION

Defendant Mark A. Rettenmaier, M.D. has moved to suppress the fruit of Best Buy's search of his computer hard drive because Best Buy was acting as a government agent or instrumentality. [Doc. No. 80 ("Best Buy Motion")] The Court heard evidence on January 11 and 12, 2017. Dr. Rettenmaier hereby submits his Post-Hearing Brief.

The evidence showed that on or about December 20, 2011, Geek Squad City ("GSC") Technician Trey Westphal searched Dr. Rettenmaier's hard drive and found an image of alleged child pornography. Westphal reported his discovery to GSC supervisor and FBI informant Justin Meade. Meade re-ran the search, identified images to show to the FBI and called the FBI to report the discovery. The FBI came to GSC, reviewed a single image, seized the hard drive and these proceedings followed. But these proceedings stem from multiple Fourth Amendment violations because GSC, Trey Westphal and especially Justin Meade were all acting as agents of the FBI when they searched Dr. Rettenmaier's hard drive.

Because of the FBI's and Best Buy's coordinated conduct, all hard drives submitted to Best Buy for repair anywhere in the United States, that were found to need data recovery services, were probably searched for child porn at GSC and, if found, were definitely reported to the FBI by an FBI informant. Thus, the evidence shows that Best Buy (acting through GSC) was a government entity and agent, so the initial discovery of questionable images by Westphal was a warrantless government search. Because the search warrants for Dr. Rettenmaier's home and hard drive were the fruit of Westphal's warrantless, government search, all evidence obtained pursuant to those warrants must be suppressed.

Even assuming, *arguendo* that Best Buy was not a government agent or entity and that Westphal's search was therefore a private search, suppression is still appropriate. That is because Westphal's supervisor, Justin Meade, was certainly a government agent. Meade's subsequent search of Dr. Rettenmaier's hard drive was a government search and

1

POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST BUY [Dockets 80, 88, 107]

it far exceeded Westphal's supposedly private search. Therefore, it was improper under the private search doctrine. Because the search warrants for Dr. Rettenmaier's home and hard drive were also the fruit of Meade's warrantless, government search, all evidence obtained pursuant to those warrants must be suppressed.

## II. OVERVIEW

Dr. Rettenmaier took his computer to his local Best Buy because it would not "boot." Best Buy removed the computer's hard drive (the "Hard Drive")[1] and shipped it to its repair and data recovery center in Brooks, Kentucky, also known as "Geek Squad City" ("GSC"). Hard drives from Best Buy stores all over the country are shipped to GSC for data recovery.

As usual, a GSC technician (or, "Tech," here Trey Westphal) reviewed recovered images on the Hard Drive. He saw a questionable image and pursuant to GSC policy he immediately contacted his Supervisor, Justin Meade. Meade was also one of eight (8) FBI informants at GSC. The FBI recruited him because he acted as a choke point for all child-porn discoveries at GSC.

Meade then re-ran Westphal's search terms, reviewed a larger number of images and selected some of those images for review by the FBI. Meade called his handler, FBI Agent Riley. Agent Riley came to Best Buy, saw the single image of "9yoJenny" (exhibit 2) and immediately seized the physical Hard Drive. Thus, the search warrants in this case are the fruit of both Westphal's initial search and Meade's more extensive search. But both of these searches were actually warrantless, government searches.

Best Buy (acting through GSC) is a government entity or agent. Its data recovery system was designed to identify and report child porn from all over the country. Best Buy and the FBI worked together to make that happen. For example, the facility was permeated by FBI informants in strategic positions to report on such things. For another,

---

[1] Unless otherwise indicated, "Hard Drive" is used herein to refer to both the actual hard drive for Dr. Rettenmaier's computer, and GSC's imaged copy of that Hard Drive.

it was permitted to maintain custody of suspected child porn in order to aid FBI investigations.

Apart from Best Buy and GSC's status as a government entity or agent, Meade was an agent of the FBI when he searched the Hard Drive. Meade was "drafted" by the FBI to report suspected child porn, he was paid and otherwise encouraged to report suspected child porn, and he expressed his desire to help the FBI in myriad ways (e.g. in emails and reported statements). Accordingly, Meade's searches of hard drives at GSC were government searches.

Meade's searches greatly exceeded the scope of the searches by GSC Techs. GSC Techs stopped searching and immediately reported to Meade as soon as they saw a single, questionable image. On the other hand, Meade sought out and scrolled through multiple images of suspected child porn to prepare them for viewing by the FBI. In this case, Meade's review was a warrantless search that led directly to the search warrants for the Hard Drive and Dr. Rettenmaier's home. The fruit of those warrants should be suppressed.

### III. ANALYSIS

#### A. BEST BUY, ACTING THROUGH GSC, IS A GOVERNMENT "ENTITY"

Whether Best Buy, acting through GSC, is a "government entity" turns on "whether it is 'invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from sovereign authority.'" *United States v. Ackerman*, 831 F.3d 1292, 1295 (10th Cir. 2016) (quoting *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat) 518, 668-69 (1819)). "When it comes to what qualifies as a public, political, or sovereign function, we know too that the 'police function' is among the paradigmatic examples." *Id.* (citations omitted). Because GSC's "law enforcement powers extend well beyond those enjoyed by private citizens. . . it is a fair candidate for a government entity."

GSC was a government entity, in part, because it was allowed to possess child pornography. Possessing child pornography is obviously a crime. *See, e.g.,* 18 U.S.C. § 2252A(a)(5). Yet GSC is allowed to keep it on an image (or "mule") of the submitted hard drive for use by the FBI and/or GSC. [1/12/17 (V.1) 106, 114, 116, 130] That is what happened on 2/3/12 when Agent Riley returned to GSC to re-review/search the contents of the Hard Drive, after the actual Hard Drive had been seized by the FBI. [1/11/17 (V.2) 48-49; 1/12/17 (V.1) 130] Agent Riley did not order GSC employees to hand over their imaged copy even though merely possessing it is illegal.

On the contrary, Agent Riley "would never interfere in a business's practices." [1/11/17 (V.1) 48-50] That statement shows that GSC was serving a public function by holding child pornography for the FBI. Additionally, the FBI's records reflect repeated references to how many child-porn cases are initiated from GSC. Presumably there are that many instances of GSC being permitted to retain child pornography (since data review is generally done from the "mule" and the mules are not immediately purged). Likewise, Justin Meade was permitted to seek out child porn on hard drives and prepare the images for viewing by the FBI. Seeking out child porn is a crime. *See* 18 U.S.C. § 2252A. Meade, a supervisor, was doing this with the knowledge and consent of GSC's *General Manager*, Randall Ratliff, who was also a FBI informant.

As explained below in the "GSC is a Government Agent Section," there was close coordination between GSC and the FBI. See also concurrently filed Summary of Exhibits. The FBI's internal documentation of its relationship with its informants, and the correspondence between the FBI and its informants, suggest a joint venture to ferret out child porn.[2] Accordingly, GSC is a government entity and its employees' searches are warrantless government searches in violation of the Fourth Amendment.

---

[2] To date, the Court has only ordered the government to produce files for four of the eight informants at GSC. *See* Doc. No. 173 at 23. The defense submits that production of the remaining files is appropriate because of the likelihood they will contain information that buttresses GSC's status as a government entity and/or agent.

## B. BEST BUY, ACTING THROUGH GSC, IS A GOVERNMENT "AGENT"

The Fourth Amendment applies to searches by private persons and entities when they act "as an agent or instrument of the state; there must be some degree of government knowledge and acquiescence." *United States v. Sherwin*, 539 F.2d 1, 6 (9th Cir. 1976) (en banc). The Supreme Court's leading case on what it means for a private party to be an "agent or instrument" of the state is *Skinner v. Ry. Labor Execs'. Ass'n*, 489 U.S. 602, 614 (1989). The *Skinner* Court followed the "common law by asking simply whether 'the Government's encouragement, endorsement, and participation' in the'" search rendered private parties government agents for Fourth Amendment purposes. *United States v. Ackerman*, 831 F.3d 1292, 1302 (10th Cir. 2016) (quoting *Skinner*, 489 U.S. at 615-16).

Common law at time of founding recognized agency when "the agent acts with the principal's consent and (in some way) to further the principal's purpose." *Id.* at 1301. The government need only consent to the conduct, not direct it. *Id.* at 1302. And helping the government does not have to be the agent's sole motive. *Id.* at 1303. Thus, the key question for agency is whether GSC had its employees search Dr. Rettenmaier's computer with the FBI's consent and to further the FBI's purposes in some way.

As set forth below, Trey Westphal's initial data review is attributable to the government because his employer GSC was acting as a government agent. The FBI knew that GSC was a target-rich environment for child porn case initiations and both Best Buy and the FBI worked together to make sure every one of them was reported to the FBI. And GSC was then permitted to retain copies of child porn to help the FBI with its investigations.

### 1. GSC and the FBI Worked Together To Investigate Child Pornography

#### a. GSC Chose to Work Closely With the FBI

GSC "chose the FBI over other agencies to investigate their cases." [1/12/17 (V.3) (FBI Supervisor Brett Johnson)] GSC management apparently tasked Justin Meade to "liaison" with the FBI. [1/12/17 (V.1) 133] GSC hosted a meeting with the FBI and gave the agents a guided tour. [Ex. 204] GSC's General Manager (Randall Ratliff) was a paid

FBI Informant. And management was aware that its supervisory personnel were being paid by the FBI. [*See, e.g.,* Doc. No. 176-4 at ¶6 (Hans informed GSC legal department he was paid by FBI)]

Further, as explained in the concurrently filed Post-Hearing Brief Re *Franks* Motion, FBI Agents were permitted to return to GSC after seizing evidence and re-review customer data with the use of forensic tools (that the tech who discovered the images did not use). *See* Post-Hearing Brief Re *Franks* Motion at 14-15. Best Buy was even developing a program that would identify child porn on its computers and the FBI gave it advice regarding the use of that program. [1/12/17 (V.2) 24; ex. 202 at 10]³ Thus, Best Buy management clearly intended that GSC work closely with the FBI.

### b. The FBI Chose To Work Closely With GSC

The FBI reciprocated Best Buy's desire to work together. On September 9, 2008, the FBI held a meeting at GSC at which members of the cyber task force were given a tour of the facility. The report of that meeting states:

> The Brooks facility repairs and conducts data recovery on thousands of computers every day. The Louisville Division has maintained close liaison with the Geek Squad's management in an effort to glean case initiations and to support the division's Computer Intrusion and Cyber Crime Program.

[Ex. 204] The FBI even considered providing training to the GSC Techs to identify child porn in order to minimize false positive identifications. [Ex. 227]

///

---

³ GSC copied information from a customer's hard drive to one of its "mules" and then repaired the imaged copy. [1/12/17 (V.1) 115-16] So a program that identified child porn on GSC's computers would also identify it on GSC's imaged copies of customer's hard drives.

### c. The Best Buy/GSC Data Recovery System Is Designed To Find Child Pornography And Turn It Over To The FBI

#### (1) All Computers Received By Best Buy Stores Nationwide That Need Data Recovery Are Sent To GSC

"All computers received at Best Buy stores nationwide are sent to [GSC] for data recovery." [Ex 130 at 1. *See also* exhibits 101 and 102 at ¶¶18a (same)] Agent Boswell testified that "if you took your computer to a Best Buy repair facility and asked for it to be repaired, there was a very good likelihood that it would arrive in the Brooks, Kentucky facility." [1/12/17 (V.2) 31; *see also* Ex 204 ("The Brooks facility [aka GSC] repairs and conducts data recovery on thousands of computers every day.")]

#### (2) The Vast Majority Of Data Recoveries Involve Data Review For Images

Westphal testified that *after* a computer repair is completed, GSC Techs search for "mission criticals" provided by client. If there are no mission criticals, then they look for "pictures, music, videos and documents." [1/12/17 (V.1) 116] So pictures and videos are commonly reviewed by GSC Techs.

#### (3) All Questionable Images Are Reviewed By a Paid FBI Informant

Anytime a questionable image is seen, the Tech immediately stops reviewing images and reports his or her discovery to the data recovery supervisor. [1/12/17 (V.1) 109, 111 and 131] There were apparently three (3) supervisors in data recovery during late 2011 and early 2012: Justin Meade, Randall Ratliff of James Christophel. But Meade alone handled all of GSC's potential child porn cases. [1/12/17 (V.1) 133-34; 1/12/17 (V.1) 144 (Meade handled 99.9% of child porn reports to FBI); 1/12/17 (V.3) 42 (Agent Cardwell testified that "whenever there was suspected child pornography, he would call.")] As explained below, the FBI is responsible for Meade's conduct.

Ratliff was GSC's General Manager, had supervision over Meade's department [Doc. No. 176-5 at ¶¶2-3] and was also a paid FBI informant. [1/12/17 (V.2) 29-30. *See*

*also* exhibits 182 and 191] The FBI considered Ratliff "highly valuable and [his] continued intelligence reporting [was] crucial for the success of Louisville's efforts." [Ex. 191 at 1] He was a "trip wire" for information. [Exhibit 191 at 224] Still the FBI was trying to increase his productivity:

- FBI was to "task the Source [i.e. Ratliff] against FBI intelligence requirements to increase the Source's reporting. . . . [Ex. 191 at 220];
- FBI believed Ratliff had "good potential" to be "developed to provide good reporting." [Ex. 191 at 105]
- Ratliff was "currently underutilized" and "should be tasked against cyber reporting priorities . . . to ensure . . . reporting on current FBI Intelligence Requirements." [Ex. 191 at 225-26]

Regardless, Ratliff left the actual review of alleged child pornography to Meade. [1/12/17 (V.3) 86]

Christophel was apparently not a CHS. But that is probably because he did not deal directly with child pornography. [See, e.g. 1/11/17 (V.2) 52 (Agent Riley does not remember ever communicating with Christophel on other cases.)]

There were a total of eight (8) FBI informants in GSC's data recovery department at various times. To date, the defense has received only four Informant Files. The Informant Files the defense has received shed light on the relationship of the FBI to its informants at GSC. For example, Informant Hans reported to the FBI that GSC "was in the process of writing a software program [that] would help them identify potential images of child pornography in their computer system." [Ex. 202 at 10]. Informant Rodgers' Informant File provides: "*Under the control and direction of the FBI*, the CW agreed to notifiy the FBI when CW detects the presence of child pornography during the regular course of CW's employment and is willing to testify in a court of law." [Ex. 202 at 22 (emphasis added)] See also concurrently filed Summary of Exhibits. The defense submits that production of the remaining files is appropriate because of
8
POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON
ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST
BUY [Dockets 80, 88, 107]

the likelihood they will contain information that buttresses GSC's status as a government entity and/or agent.

### 2. Justin Meade: Choke Point for all Alleged Child Porn Discovered at GSC and an FBI Informant

As stated above, Meade handled all reports of child porn at GSC. Meade testified that it was his "job" to "liaison" with the FBI. [1/12/17 (V.1) 133]

#### a. Meade was "drafted" by the FBI (twice)

In addition to Meade's private employer, Meade was initially "drafted" as a "Confidential Human Source" or "CHS" by the FBI in October 2008. [Ex. 189 at 2] He was apparently "drafted" again on November 30, 2009. [Ex. 152 at 1] The FBI drafted Meade to gain case initiations. As explained in the FBI's "Source Opening Communication":

> CHS is a [sic] manages technicians that provide repair service of computers that come into the service center from across the country. When CP is identified or potentially identified, the technicians stop work immediately and CHS notifies Agent. CHS' reporting results in initiation nationwide."

[Ex. 152 at 3] According to his Informant File, Meade had been an informant for "more than five consecutive years." [Ex. 189 at 34] Further, Meade had "value due to his/her unique or potential access to FBI priority targets or intelligence responsive to FBI national and/or local collection." [Ex. 189 at 74] Likewise, Meade had "[e]xcellent and frequent (more than once per week) direct and/or indirect access to FBI priority targets." [Ex. 189 at 78]

#### b. Meade specifically agreed to help the FBI

Agent Boswell testified that "I asked them [J. Meade and R. Ratliff] to help the FBI with images or things that they thought were suspicious on the computers. Yes, Sir."

[1/12/17 (V.2) 32][4] Meade obviously agreed to help the FBI given that he was signed up as an informant. Judging by his conduct, Meade's response was an enthusiastic "yes!"

### c. Meade was paid by the FBI (and falsely denied that payment under oath)

Meade denied that he was ever paid by the FBI. [1/12/17 (V.1) 137] But the testimony of government agents and the FBI's own informant file prove that Meade was paid by the FBI. [1/11/17 (V.1) 94 (Meade was paid by FBI on 9/23/11); Ex. 136, ¶10 (payment to Meade)]

Moreover, the FBI's documents from the second time Meade was drafted in November 2009 reflect a "payment name" of "Burgley." [Ex. 152 at 1 and 6] Elsewhere, "Burgley" is identified as Meade's assigned "code name." [Ex 189 at 82] "Burgley" is also the same name Meade signed when he was paid in September 2011. [Ex. 152 at 40] Yet Meade testified that the name meant nothing to him. [1/12/17 (V.1) 138]

Meade lied. According to the FBI's records, Meade "was aware of his/her status as a CHS." [Ex. 189 at 79] Back in 2009, Meade provided a "payment" or "code" name (Ex. 152 at 1) and was advised that there was no guarantee that he would be paid (see, e.g. ex 189 at 8). Thus, the idea of a payment from the FBI was not a novel concept. When Meade was paid in 2011, he signed the same code name he had been provided in 2009 for that purpose. It was a memorable event.

Meade's self-serving denial that he was paid calls other self-serving aspects of his and other informants' testimony into doubt. Specifically, every informant in this case has minimized his involvement with the FBI. Meade denied payment. Ratliff swore "I was paid $500 in 2011 by Special Agent Tracey Riley. It made me uncomfortable to receive money and I contacted our legal department." [Doc. No. 176-5 at ¶7] But because the

---

[4] Agent Boswell also testified that "Individuals [were] designated as confidential human sources [like Meade and Ratliff because] they were in a position to report on certain types of information, and I signed them up." [1/12/17 (V.2) 33] And the FBI's relationship with informants at GSC "was in place before I got there. . . . Then when I left, I passed those on to somebody else." [1/12/17 (V.2) 32]

FBI had previously paid Ratliff an additional $500 in 2008, [Ex. 182 at 10] his attempt to minimize his involvement with the FBI rings hollow. Michael Hans swore he reported the money to the legal department and gave his $500 to charity. [Doc. No. 176-4 at ¶6] These FBI Informants' desire to minimize the extent of their relationship with the FBI is understandable given that many people dislike informants, but it should also undermine their credibility on this issue.

### d. Meade was paid by the FBI in a *quid pro quo*—money for information

The FBI's "Payment Request" states that Meade was paid $500 for "services rendered." [Ex. 152 at 40] The FBI's "Operational Payment justification narrative" provides that "CHS has generated several cases that have been opened and successfully investigated in several divisions, enabling more CP offenders to have search warrants issued and eventually arrests made." [Ex. 185 at 2] As Agent Boswell explained, "I took up their time, and they provided us with useful information. And I went down and looked at it, and sometimes it took a significant amount of time. I compensated them for that time." [1/12/17 (V.2) 39]

### e. Meade's emails with the FBI leave no doubt that he was attempting to help the FBI

On 10/15/09, Agent Cardwell wrote to Meade that "I need to do some admin stuff in regards *to you helping us*." [Ex. 174 at 4 (emphasis added)] According to Agent Cardwell, the "us" was the FBI and the "help" was working as a "source." [1/12/17 (V.3) 46]

On 10/29/09 Agent Cardwell reached out to Meade to discuss "collaboration." [Ex. 174 at 2] According to Agent Ranieri, "our goal was to get them [i.e. the informants at GSC] to *help us* within their policies and procedures *any way they could.*" [1/12/17 (V.3) 61 (emphasis added)]

On 7/20/10 Meade advised Agent Riley that GSC would receive an "influx" of child porn after school started. [Ex. 106] A March 9, 2011 email from Meade to Agent

Riley demonstrates their close working relationship, and that it was not limited to reporting actual child porn that Techs discovered, but involved investigating leads.

> Hi Tracey!!
>
> [¶1] I have two issues I need help with which I don't think will be too big of problems for you. . .
>
> [¶2] The most recent unit that you took possession of from Setauket NY the owner of the drives is apparently pestering the store about the location of the drive. *Can you have someone from FBI reach out and make contact so our retail location doesn't have to play dumb with the client?*
>
> [¶3] Also we have a unit out of Chicago which the local store says they saw *inappropriately named files* on (did not see content) which we have not seen the content of either because we do not have the signed paperwork that authorizes us to evaluate the drive. *Is there anything you can or would to do with something like this?*
>
> --Justin

[Ex. 162 at 28 (emphasis added)] The italicized portion of the second paragraph shows the close working relationship between Meade, GSC and the FBI. The italicized portion of the third paragraph demonstrates Meade's specific intent to help the FBI.

On January 6, 2012, Riley asked Meade "[a]ny chance one of your guys can give a tour to one of my guys while I look at the drive?" Meade responded "[y]eah that should be able to be arranged." [Ex. 162 at 15]

An August 10, 2012 email to Riley demonstrates that Meade was investigating on behalf of the FBI:

> "*We have found no other evidence* of CP other than 3 copies of this one photo contained in the recovered data. Is this something you would want to evaluate or no."

[Ex. 162 at 7 (emphasis)] Meade's law enforcement activity extended beyond suspected child porn. Meade emailed Agent Riley about a "unit" with a "Secret Service Evidence

tag on it," [Ex. 162 at 11-12], and a unit with "Kentucky State Police Evidence tape." [Ex. 162 at 6]

### f. Meade's FBI handlers' conduct toward Meade demonstrates their understanding that they were working together to find child pornography

On June 16, 2009, Agent Boswell wrote to Meade: "Thank you for all of your help. You and Randy [Ratliff] have been a great help to me. Thanks again. Don't ever hesitate to call me. I will always get right back to you." [Ex. 178 at 5] On April 4, 2012, Agent Riley emailed Meade that "[y]ou can email me whenever you have an idea." [Ex. 162 at 12]

On June 7, 2012, Agent Riley emailed Meade "How goes it? Your section has been quiet lately. Just touching base and hoping *I didn't jinx either of us!*" [Ex. 162 at 7] The email suggests the common goal of the FBI and Meade was to find child porn, so much so that just discussing it could "jinx" them.

Likewise, Agent Riley's 2/3/12 re-review of images from Dr. Rettenmaier's Hard Drive demonstrates their close working relationship. Agent Riley was permitted to view images that neither she nor Trey Westphal had never seen before and she was permitted to view them using forensic tools (that were not otherwise used when exhibit 2 was discovered). See Post-Hearing Brief Re *Franks* Motion at 14-15.

### g. Meade and other GSC informants were "tasked" by the FBI and sought the FBI's "guidance"

Meade's opening paperwork reflects that CHSs (like Meade) must be given instructions "before first operational *tasking*." [*See* Ex. 189 at 7 (emphasis added). *Cf.* Ex. 191 at 220 and 225 (Ratliff should be "*tasked* . . . against FBI intelligence requirements)] And Meade always responded promptly to FBI inquiries. [*See* Ex. 152 at 61; Ex 189 at 36, 37] Not surprisingly, when Agent Riley wanted to return to GSC to re-review the Hard Drive on 2/3/12, she did *not* ask for permission; she simply said she "need[ed]" to come back and proposed a time. [Ex. 162 at 15]

13

Meade also reached out to his handlers for guidance. For example, on August 5, 2011, he emailed Agent Riley for "guidance" about an "unusual situation" (i.e. Meade had reason to believe he was dealing with a stolen computer). [Ex. 162 at 19] In April 2011, Meade contacted the FBI about a customer who hired a lawyer because his computer (which the FBI had apparently seized) was not being returned to him. [Ex. 162 at 23]

In summary, Best Buy was an agent of the FBI because: (1) its data recovery program funneled hard drives from all over the country to one location (GSC) where the vast majority of hard drives were searched for child pornography; (2) all potential child pornography that was discovered as a result of this program was then funneled to a paid FBI Informant (Meade) who conducted another search, prepared images for viewing by the FBI, contacted the FBI and then showed the images to the FBI; (3) GSC was teeming with other FBI Informants, including its General Manager; (4) GSC and the FBI worked closely together to implement the above-program; and, (5) both Meade and GSC were exempted from generally applicable laws that prohibit the possession and viewing of child porn. Accordingly, Trey Westphal's search on December 20, 2011 that led to the discovery of the image of 9yoJenny was a warrantless government search, the warrants in this case the fruit of that warrantless government search, so suppression is appropriate.

### C. MEADE WAS A GOVERNMENT AGENT, HIS WARRANTLESS SEARCH OF THE HARD DRIVE EXCEEDED WESTPHAL'S, AND THE SEARCH WARRANTS ARE THE FRUIT OF HIS ILLEGAL SEARCH

#### 1. Meade Is A Government Agent (Even if All of GSC Is Not)

Apart from Best Buy and GSC's status, Meade was a government "agent." There is no doubt that he was acting "with the [FBI's] consent and (in some way) to further the [FBI's] purpose." *Ackerman*, 831 F.3d at 1302 (quoting *Skinner*, 489 U.S. at 615-16). Additionally, like GSC, Meade was encouraged to peruse child porn and prepare it for inspection by his FBI handler. That the FBI permitted Meade to possess and view child porn even though it is obviously illegal further supports his government-agent status. *See,*

*e.g., Ackerman*, 831 F.3d at 1295 ("When it comes to what qualifies as a public, political, or sovereign function, we know too that the 'police function' is among the paradigmatic examples."). This is in addition to his role of verifying and reporting child porn to the FBI that is discovered by GSC Techs.

### 2. Meade's Government Search Violated The Fourth Amendment Because It Far Exceeded Westphal's Search

"In a situation where 'a government search . . . follows on the heels of a private one[,]" "[t]he additional invasions of [a person's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *United States v. Lichtenberger*, 786 F.3d 478, 482 (6th Cir. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 115 (1984)). The government has the burden of showing that it is a "virtual certainty" that the government search did not exceed the private search. *Lichtenberger*, 786 F.3d at 488. *See also United States v. Johnson*, 806 F.3d 1323 (11th Cir. 2015) (warrantless law-enforcement search conducted after a private search violates the Fourth Amendment to the extent it is broader than the private search.). Thus, "[t]o accomplish [a constitutional search], [Meade would have] had to proceed with 'virtual certainty' that the 'inspection of the [Hard Drive] and its contents would not tell [Meade] anything more that he already had been told by [Westphal].'" *Id.* at 488 (quoting *Jacobsen* at 119).

Meade's government search went way beyond Westphal's original search. Westphal stopped when saw the first problematic image. [1/12/17 (V.1) 109 and 111] Further, Westphal explained that if someone were to enter his search terms, that person would still have to scroll through a number of other images to find the problematic images. [1/12/17 (V.1) 112]

Similarly, Meade explained that Westphal "would have stopped as soon as he saw something that made him uncomfortable, then you [i.e. Meade] *would go beyond that* and look and see are there things here worth reporting to the FBI, and is this this person's computer, that sort of thing." [1/12/17 (V.1) 133 (emphasis added)] Meade also

explained that after you "recreate the search," you "either find what's on that page or scroll down and find more problematic images and make that available to the FBI." [1/12/17 (V.1) 131] Meade also testified that he would scroll through the images "to get a general consensus of what the data looks like." [1/12/17 (V.1) 150]

In short, Meade's warrantless government search looked at a lot more images than Westphal. (And the government certainly cannot meet *its burden* to prove otherwise.) And Meade's warrantless search led directly to Agent Riley's viewing of "9yoJenny" (exhibit 2), seizure of the Hard Drive and Kayle's Search Warrant Affidavits. Regardless of Best Buy and GSC's status, the warrants and everything discovered thereby must be suppressed because they are the fruit of Meade's warrantless search.

## IV.   CONCLUSION

GSC acted as a government agent or entity, so GSC employee Trey Westphal's search of the Hard Drive was a warrantless government search. At a minimum, Justin Meade was a government agent, his search exceeded Westphal's search and led directly to the warrants in this case. Either way, the warrants in this case are the fruit of these warrantless searches and all evidence seized pursuant to these warrants should be suppressed.

Dated: March 1, 2017

Respectfully submitted,

BIENERT, MILLER & KATZMAN

*/s/ Kenneth M. Miller*
James D. Riddet
Kenneth M. Miller

Attorneys for Mark A. Rettenmaier

373997-1

16
POST-HEARING BRIEF RE: MOTION TO SUPPRESS EVIDENCE BASED ON
ILLEGAL SEARCH OF DEFENDANT'S COMPUTER BY PERSONNEL OF BEST
BUY [Dockets 80, 88, 107]