Name  AUSA Michael Anthony Brown

Address  1000 U.S. Courthouse, 312 N. Spring Street

City, State, Zip  Los Angeles, CA  90012

Phone  (213) 894-8230

Fax  (213) 894-8513

E-Mail  Anthony.Brown@usdoj.gov

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

United States of America,

PLAINTIFF(S),

v.

Mark Albert Rettenmaier,

DEFENDANT(S).

CASE NUMBER:

SA CR 14-188-CJC

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that _____ the United States of America _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☒ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

☒ Order (specify):
  Granting in part Franks motion
  (ECF Nos. 252, 253)

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on _____ May 15, 2017 _____ . Entered on the docket in this action on May 15, 2017 .

A copy of said judgment or order is attached hereto.

June 14, 2017 _____

Date

s/Michael Anthony Brown _____

Signature

☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

CERTIFICATION OF UNITED STATES ATTORNEY

I hereby certify that this appeal is not taken for purpose of delay and that the evidence suppressed or excluded is a substantial proof of a fact material in the proceeding.

DATED: June 14, 2017

SANDRA R. BROWN
Acting United States Attorney

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | SACR 14-00188-CJC | Date | May 15, 2017 |
|---|---|---|---|

Present: The Honorable   CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Interpreter   None

| Melissa Kunig | Debbie Hino-Spaan; | Anthony Brown; Gregory Scally |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Mark Albert Rettenmaier | X | | X | James Riddet | X | | X |
| | | | | Kenneth Miller | X | | X |

PROCEEDINGS:   **PRETRIAL CONFERENCE**

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE PURSUANT TO FRANKS V. DELAWARE [78]**

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH [80]**

---

Pretrial conference held. The Court confers further with counsel confer regarding tentative rulings on defendant's motions.   The Court hears oral argument.   For the reasons stated on the record, the Court rules on the motions as follows:

- Defendant's Motion to Suppress Evidence Pursuant to Franks v. Delaware [78]: **GRANTED IN PART**

- Defendant's Motion to Suppress Evidence Based On Illegal Search [80]: **DENIED**

The parties are ordered to meet and confer and submit a stipulation and proposed order no later than May 22, 2017 regarding a new pretrial conference and trial date.

**MOT [78]: 0:40**
**MOT [80]: 0:40**
**PTC:      0:03**

1 : 23

Initials of Deputy Clerk   mku

CC:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | SACR 14-00188-CJC | Date | May 15, 2017 |
|---|---|---|---|

Present: The Honorable   CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

Interpreter   None

| Melissa Kunig | Debbie Hino-Spaan; | Anthony Brown; Gregory Scally |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Mark Albert Rettenmaier | X | | X | James Riddet | X | | X |
| | | | | Kenneth Miller | X | | X |

**PROCEEDINGS:   PRETRIAL CONFERENCE**

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE PURSUANT TO FRANKS V. DELAWARE [78]**

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON ILLEGAL SEARCH [80]**

Pretrial conference held. The Court confers further with counsel confer regarding tentative rulings on defendant's motions.   The Court hears oral argument.   For the reasons stated on the record, the Court rules on the motions as follows:

- Defendant's Motion to Suppress Evidence Pursuant to Franks v. Delaware [78]: **GRANTED IN PART**

- Defendant's Motion to Suppress Evidence Based On Illegal Search [80]: **DENIED**

The parties are ordered to meet and confer and submit a stipulation and proposed order no later than May 22, 2017 regarding a new pretrial conference and trial date.

MOT [78]: 0:40
MOT [80]: 0:40
PTC:       0:03

| 1 | : | 23 |
|---|---|---|

Initials of Deputy Clerk   mku

CC:

<pre>
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

 3        HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE

 4

 5  UNITED STATES OF AMERICA,        )
                                     )
 6                 Plaintiff,        )        CERTIFIED
                                     )
 7        vs.                        )
                                     )  Case No.
 8  MARK ALBERT RETTENMAIER,         )  8:14-cr-00188-CJC-1
                                     )
 9                 Defendant.        )
    ─────────────────────────────────)

10

11

12

13

14              REPORTER'S TRANSCRIPT OF

15              PRETRIAL CONFERENCE

16              MONDAY, MAY 15, 2017

17                   9:59 A.M.

18              SANTA ANA, CALIFORNIA

19

20

21

22  ─────────────────────────────────────────────────

23         DEBBIE HINO–SPAAN, CSR 7953, CRR
            FEDERAL OFFICIAL COURT REPORTER
24        411 WEST FOURTH STREET, ROOM 1-191
            SANTA ANA, CALIFORNIA 92701-4516
25              dhinospaan@yahoo.com
</pre>

UNITED STATES DISTRICT COURT

1                  **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4           SANDRA R. BROWN
            United States Attorney
5           BY:  ANTHONY BROWN
                 Assistant United States Attorney
6           Criminal Appeals Section
            312 North Spring Street
7           Suite 1000
            Los Angeles, California 90012
8           (213) 894-8230

9           SANDRA R. BROWN
            United States Attorney
10          BY:  GREGORY SCALLY
                 Assistant United States Attorney
11          United States Courthouse
            411 West Fourth Street
12          Suite 8000
            Santa Ana, California 92701
13          (714) 338-3592

14  **FOR THE DEFENDANT:**

15          BIENERT MILLER & KATZMAN PLC
            BY:  JAMES D. RIDDET, ESQ.
16               KENNETH MILLER, ESQ.
            903 Calle Amanecer
17          Suite 350
            San Clemente, California 92675
18          (949) 369-3700

19

20

21

22

23

24

25

**SANTA ANA, CALIFORNIA; MONDAY, MAY 15, 2017**

**9:59 A.M.**

**- - -**

THE COURTROOM DEPUTY:  Calling Item No. 1,

SACR 14-188, United States of America versus Mark Albert

Rettenmaier.

Counsel, please state your appearances.

MR. BROWN:  Good morning, Your Honor.  Anthony Brown

and Greg Scally for the United States.  Also at counsel table

is FBI Special Agent Cynthia Kayle.

THE COURT:  Good morning to all of you.

MR. RIDDET:  Good morning, Your Honor.  James Riddet

and Ken Miller for Dr. Rettenmaier, and he's present at counsel

table.

THE COURT:  Hello, Dr. Rettenmaier.  Hello,

Mr. Miller.  Hello, Mr. Riddet.

I know everybody is anxious for my rulings on the motions

to suppress, and I do have a tentative.  I'm just going to be

ruling from the bench as opposed to a written order.  But I

will take my time and give you what my tentative findings are

on the motions.

The bottom line is my tentative is to deny

Dr. Rettenmaier's motion to suppress based on the warrantless

search of his hard drive but grant his *Franks* motion as to the

search of his home.

1        Let me first address Dr. Rettenmaier's motion to suppress

2   based on a warrantless search of his hard drive.

3        The Fourth Amendment provides that the right of the people

4   to be secure in their persons, houses, papers, and effects

10:01AM  5   against unreasonable searches and seizures shall not be

6   violated.  Warrantless searches are per se unreasonable unless

7   justified by an exception to the general rule.  A search occurs

8   when the government intrudes upon an expectation of privacy

9   that society is prepared to consider reasonable.

10:01AM 10        Dr. Rettenmaier's motion highlights five searches that he

11   contends violated his Fourth Amendment rights; Mr. Westphal's

12   review of recovered data, Mr. Meade's first replication of

13   Mr. Westphal's search, Mr. Meade's replication of

14   Mr. Westphal's search and review of the results with

10:02AM 15   Agent Riley, Mr. Keown's -- I don't know if he's an agent at

16   the FBI -- his osTriage search, and Agent Riley's return trip

17   to Geek Squad City.

18        I do not believe there is any constitutional problem with

19   any of these searches because Dr. Rettenmaier had no reasonable

10:02AM 20   expectation of privacy in his hard drive.  As a consequence,

21   the government and its purported confidential human sources at

22   Geek Squad City were free to conduct any search of the hard

23   drive without a warrant and without violating Dr. Rettenmaier's

24   Fourth Amendment rights.

10:02AM 25        As a prerequisite to establishing the illegality of a

**UNITED STATES DISTRICT COURT**

search under the Fourth Amendment, a defendant must show that
he had a reasonable expectation of privacy in the place
searched.  A defendant may do so by demonstrating a subjective
expectation that his activities would be private and that his
expectation was one that society is prepared to recognize as
reasonable.

Dr. Rettenmaier's expectation of privacy in his hard drive
at Geek Squad City after he gave it to Best Buy and repeatedly
consented to data recovery services is not one that society is
prepared to recognize as legitimate or reasonable.

Dr. Rettenmaier surrendered his computer to Best Buy on
November 1st, 2011.  Before he did so, he filled out a form in
which he selected as an add-on offer to receive Best Buy's data
backup or transfer.  Best Buy properly memorialized
Dr. Rettenmaier's desire for data recovery in its initial
service order stating that the technician should back up info
on his hard drive.

The Best Buy technician, however, wasn't able to repair
Dr. Rettenmaier's computer because it had a bad hard drive.
The technician's notes clearly state that Dr. Rettenmaier would
need data recovery services if he wanted to retain any of the
information on his hard drive.

Dr. Rettenmaier's initial service authorization did not
include data recovery services.  Presumably Best Buy contacted
Dr. Rettenmaier once its technician determined that the hard

drive was the issue.

On November 20th, 2011, Dr. Rettenmaier returned to Best Buy and explicitly authorized data recovery services on the hard drive.  He signed another service order stating that he had approved data recovery services.  His signature follows a printed section entitled "I agree to or that," which is followed by 12 short statements.  Approximately one inch above his signature in entirely legible print is the Statement 8 which reads, "I am on notice that any product containing child pornography will be turned over to the authorities."

Subsequently Best Buy sent Dr. Rettenmaier's hard drive to Geek Squad City.  For some reason, Dr. Rettenmaier's signed authorization for data recovery services did not transfer to Geek Squad City, so Geek Squad City called Dr. Rettenmaier on November 28, 2011.

Geek Squad City's caller, Ariana, immediately identified herself as "Geek Squad Data Recovery, where you sent your hard drive."  Dr. Rettenmaier then said "sure" when she informed him that the call could be recorded and asked for his consent.  She then told Dr. Rettenmaier Geek Squad City needed to get a voice waiver from him and elaborated that Geek Squad City needed his express consent, which would be recorded on the phone call.

Dr. Rettenmaier affirmatively stated that he understood and was willing to consent over the phone.  Her first substantive question was whether the data Geek Squad City was

1   attempting to retrieve was being used for any litigation or

2   regulatory matters.  She then sought Dr. Rettenmaier's

3   confirmation that he was requesting Geek Squad and its agents

4   to inspect, evaluate, and identify the problem and/or retrieve

10:06AM 5   and minimize the damage to the equipment, data, and media.

6        She went on to state, "Geek Squad will store any retrieved

7   data for up to 30 days," and she warned Dr. Rettenmaier that

8   his data may not be retrievable and, therefore, not useful for

9   any particular purpose.

10:06AM 10       Dr. Rettenmaier then confirmed his address as the Rodeo

11   Circle address of his personal residence, not the Hospital Road

12   address he put on the initial form.

13       She then told him that the hard drive had been diagnosed

14   for a Level 2 recovery, that the hard drive appeared to have

10:07AM 15   been restored somehow, and that there appeared to be some

16   underlying data visible.  In her elaboration of Level 2

17   recovery, she stated that Dr. Rettenmaier agreed to be solely

18   responsible for all data found and transferred by Geek Squad

19   including any penalties that are associated with the possession

10:07AM 20   of said data.  Then, when prompted by Ariana to say, "Yes, I

21   agree" if he agreed to the terms and conditions,

22   Dr. Rettenmaier stated, "Yes, I agree."

23       After Dr. Rettenmaier agreed, Ariana then went over the

24   procedure.  She explicitly stated that Geek Squad City would

10:07AM 25   call him to go over the results of its work with him including

the amount of data that was recovered, the quality of the data.
She told him that if he was unsatisfied with the results, Geek
Squad City would "send it back to the Best Buy store for you to
pick up."

10:08AM    He said, "Okay."

And then Ariana asked him if he still wanted to continue
with the data recovery, to which he said, "Yes."  Then in
response to her question as to which were the most critical
files he wanted to have retrieved, Dr. Rettenmaier said, "Uh,

10:08AM well, I guess I need all my photographs."  He went on to also
specify Excel files, Quicken files, and text and Word
documents.  She then told him that she would log in the notes
that he wanted to go ahead with data recovery and that those
were his most critical files, to which he said, "Okay."

10:08AM    Dr. Rettenmaier, a sophisticated doctor, repeatedly told
Best Buy that he wanted his data recovered.  When his initially
requested repair was unsuccessful, Best Buy gave him another
opportunity to consider whether to authorize data recovery.  He
did so by signing a service order on which Best Buy clearly

10:09AM informed him that any device containing child pornography would
be turned over to law enforcement.

Then, on top of that, Best Buy sought his consent a third
time calling him to discuss and obtain his consent for the
particular form of data recovery necessary.  In that phone

10:09AM call, it was made clear to Dr. Rettenmaier that the hard drive

**UNITED STATES DISTRICT COURT**

was no longer at the local Best Buy, that given his consent,
Best Buy would inspect his hard drive, retrieve all the data it
could, and evaluate the quality of the data retrieved, that
Best Buy would store his retrieved data separate from his hard
drive, and that he would be responsible for all data found and
transferred by Geek Squad, including any penalties that are
associated with the possession of said data.

Having been made aware for a third time at even greater
detail what Best Buy would do to his hard drive,
Dr. Rettenmaier gave clear, unambiguous, repeated consent.

None of Dr. Rettenmaier's actions remotely exhibited an
actual expectation of privacy or showed that he sought to
preserve his hard drive as private.  Even had he done so, the
concept of an interest in privacy that society is prepared to
recognize is reasonable is, by its very nature, critically
different from the mere expectation, however well justified,
that certain facts will not come to the intention of the
authorities.

Dr. Rettenmaier cannot credibly argue that he was
surprised when Geek Squad City technicians, strangers to him,
performed the data recovery services he authorized, which, as
Geek Squad City told him, entailed recovering his images
identified by him as critical data and examination of the
quality of the recovered images.

Dr. Rettenmaier cannot reasonably have expected that the

1   child pornography on his hard drive would remain private

2   through the data recovery process he authorized.  And

3   Dr. Rettenmaier's only reasonable expectation was that once

4   child pornography was found, Geek Squad City would turn around

10:11AM 5   and show it to the FBI given that Geek Squad City put him on

6   notice that it does so whenever it finds child pornography.

7        Because none of the searches of Dr. Rettenmaier's hard

8   drive infringed on a reasonable expectation of privacy, his

9   first motion to suppress evidence found on his hard drive is

10:11AM 10  denied.

11       Now I will turn to Dr. Rettenmaier's second motion, the

12  *Franks* motion to suppress, as that motion relates to the search

13  of his home.  To prevail on a *Franks* challenge, a defendant

14  must establish by a preponderance of the evidence that, one,

10:12AM 15  the affiant knowingly and intentionally or with reckless

16  disregard for the truth made false or misleading statements or

17  omissions in support of the warrant application; and, two, the

18  false or misleading omission was material; that is, it was

19  necessary to the finding of probable cause.

10:12AM 20       Agent Kayle's affidavit contained several false or

21  misleading statements or omissions that she made with reckless

22  disregard for the truth.  Perhaps most troubling, she falsely

23  stated in the affidavit that the Jenny image was child

24  pornography.  However, the Jenny image, although distasteful

10:12AM 25  and disturbing, was not child pornography.  It was child

erotica, the possession and viewing of which is not unlawful.

The image is not sadistic.  It does not depict the infliction

of pain, physical or mental cruelty, or bondage, nor is the

image a lascivious exhibition of the genitals as no genitalia

10:13AM 5   can even be seen in the image.

Agent Kayle did not bother to view the image before filing

her affidavit as she should have done so.  She apparently

relied on the simple description of it provided by Agent Riley.

But Agent Riley never said the image was child pornography in

10:13AM 10  her communications with Agent Kayle.  And her simple

description of it that she did provide to Agent Kayle falls far

short of describing child pornography.

Agent Kayle's affidavit also failed to state that the

image was discovered on the unallocated space of

10:13AM 15  Dr. Rettenmaier's hard drive.  Yet Agent Kayle's e-mail

communication with her supervisor, Michael Osborne, clearly

reflects that she was acutely aware of the evidentiary

significance of images on unallocated space, specifically, the

difficulty in proving that the image was created, accessed, or

10:14AM 20  deleted by Dr. Rettenmaier or, in other words, that it was

knowingly possessed by him.

Finally, Agent Kayle's affidavit falsely stated that no

attempts other than Agent Riley's January 6, 2012 visit to Geek

Squad City were made to obtain evidence of child pornography.

10:14AM 25  That statement was simply not true.  Either individually or

**UNITED STATES DISTRICT COURT**

together, Agent Riley and Mr. Meade, a paid confidential human
source for the FBI, had conducted three separate searches of
the hard drive without a warrant.  And a fourth search was
attempted by Mr. Keown with a program osTriage.  Yet none of
those searches or attempted search was disclosed by Agent Riley
or mentioned by Agent Kayle in her affidavit.

The second step of the *Franks* analysis is to determine
whether the false or omitted information was necessary to the
finding of probable cause or, more specifically, the finding
that there is a fair probability that evidence of a crime may
be found in the place to be searched.

Once corrected, Agent Kayle's affidavit merely describes
one image of child erotica found on the unallocated space of
the hard drive.  The corrected affidavit also included the
standard boilerplate language regarding the collection habits
and character of people who view child pornography.

This one image of child erotica, even considered together
with the standard boilerplate language not tailored to any
specific fact about Dr. Rettenmaier or his behavior, is simply
not sufficient to search Dr. Rettenmaier's entire home, the
place where the protective force of the Fourth Amendment is the
most powerful.

Because I find the corrected affidavit does not support
probable cause to search Dr. Rettenmaier's home, his *Franks*
motion to suppress the evidence seized from his home is

1    granted.

2        If there are any questions any of you have, I'll try to do

3    my best to answer them.  Obviously I've gone through the

4    evidence pretty extensively.

10:16AM 5    One case that came down by the Ninth Circuit that I

6    thought was quite significant, and it came down after our

7    evidentiary hearing, was the *United States vs. Perkins*.  And it

8    indicates specifically that, when you're dealing with alleged

9    child pornography under the category of lascivious exhibition

10:17AM 10   of the genitals, that you must attach the image for the

11   magistrate's independent review.  And it stands for the

12   proposition that child erotica by itself is not sufficient to

13   support probable cause.

14       I found this case quite helpful and instructive in this

10:17AM 15   case as far as whether the Jenny image that was not given to

16   the magistrate judge for the warrant, but which was submitted

17   at the evidentiary hearing, and as I indicated, I do not

18   believe that that image is child pornography.  It's not

19   sadistic, which is a very high burden to prove, and it is not

10:18AM 20   lascivious exhibition of the genitals.

21       I know there was other wording in the affidavit talking --

22   I'll get the specific wording -- that there were other images

23   of child pornography or at least suggested child pornography

24   which depicted the genitalia of the young girls, but I believe

10:18AM 25   under *Perkins*, again, these images needed to be shown to the

**UNITED STATES DISTRICT COURT**

1    magistrate judge so she or he -- in this case he -- can make

2    his own independent assessment on whether they were child

3    pornography or lascivious exhibition of the genitalia of young

4    girls.  And as we all know, those images were not shown to the

10:19AM 5    magistrate judge, nor were they even presented to me during the

6    evidentiary hearing.

7         So for purposes of my analysis on the corrected affidavit,

8    all I have is the one Jenny image and the boilerplate standard

9    language.  And, again, I don't believe that that's sufficient

10:19AM 10   for probable cause.

11            MR. RIDDET:  May we have just a moment, Your Honor,

12   in response to your question?

13            THE COURT:  You may.

14            **(Counsel conferred off the record.)**

10:19AM 15            MR. BROWN:  Your Honor, are you going to hear

16   argument on this?

17            THE COURT:  Yeah.  But I'll give the defense, since

18   it's the defense motions, the first opportunity.

19            MR. RIDDET:  Your Honor, I gather this is in the

10:20AM 20   nature of a tentative or is this actually your decision?

21            THE COURT:  How do I put it, Mr. Riddet?  I wanted

22   to be respectful to both sides, so I wanted to give you both an

23   opportunity, if there's anything you'd like to say, to convince

24   me, tell me where I was wrong.  But as you could tell, it was a

10:20AM 25   lengthy tentative, so I'm pretty firm in my thought, in my

**UNITED STATES DISTRICT COURT**

```
  1   analysis on this.  I've thought about it.  I've had several

  2   weeks to be able to do that in the briefing.  I'm just trying

  3   to be transparent and honest with both sides.

  4           MR. RIDDET:  I appreciate that.  We have just a

  5   couple of comments about it.

  6           THE COURT:  Sure.  It's your record.  It's

  7   important.

  8           MR. MILLER:  Thank you, Your Honor.  And they're

  9   both very brief.

 10       The first point -- and I'm speaking about the reasonable

 11   expectation of privacy in the computer -- is that giving Best

 12   Buy permission to search through the computer is just different

 13   from giving it to the FBI, law enforcement.  And there was no

 14   consent that I'm aware of for law enforcement to go through

 15   that computer, No. 1.

 16       And, No. 2, as I listened to the rationale, what seemed to

 17   me the Court was saying was, well, you know when you give this

 18   to Best Buy, they're going to turn it over to law enforcement

 19   because they're going to find child porn.

 20       And I would submit there was no evidence submitted

 21   anywhere that Dr. Rettenmaier knew that child porn was on the

 22   Seagate hard drive that was submitted to Best Buy.  So he

 23   wouldn't have known that it was going to be turned over to law

 24   enforcement.

 25       And with that, I would submit unless the Court has any
```

1    questions.

2         THE COURT:  No, it's -- that I wouldn't say is

3    exactly what I'm finding.  What I'm saying is Dr. Rettenmaier

4    had this hard drive.  He gave it to a third party, a stranger.

10:22AM 5    And he knew that this stranger, Best Buy, Geek Squad City,

6    would be looking at his entire hard drive.

7         Did I think that he consciously was aware that they would

8    be sharing this with the FBI?  No.  But for purposes of my

9    analysis, it doesn't matter.  What matters is he surrendered

10:22AM 10   his hard drive to a complete stranger knowing that it would be

11   looked at, anything on it would be looked at.  And he was also

12   told if we find anything that is contraband or inappropriate or

13   specifically child pornography, we're turning it over to the

14   FBI.

10:23AM 15        In light of those facts, Mr. Miller, I don't see how he

16   could have any reasonable expectation of privacy in that.

17        MR. MILLER:  I would at least add onto that, that

18   when I read the scope of the waivers, it seemed as though if an

19   improper image were discovered, the image would be turned over

10:23AM 20   to the FBI, not the entire computer would be given to the FBI

21   for them to search as they want.

22        But with that, Your Honor, I will submit.

23        THE COURT:  Okay.

24        MR. RIDDET:  We have no additional comments, Your

10:23AM 25   Honor.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Okay.
 2              MR. RIDDET:  Thank you very much.
 3              THE COURT:  Mr. Brown.
 4              MR. BROWN:  Your Honor, let me address Perkins
10:23AM  5 first.
 6              THE COURT:  All right.
 7              MR. BROWN:  Perkins is an unusual case with some
 8 unusual facts.  And it's because of the nature of the facts in
 9 that case that it doesn't apply here.
10:24AM 10      The first thing is that Perkins was decided just about a
11 month ago, and Perkins is from 2017, but this search took place
12 in 2012.  The rule that was announced in Perkins was not
13 Ninth Circuit law at the time that the search was conducted in
14 this case.  There was no requirement that agents provide copies
10:24AM 15 of images that were alleged to be lascivious exhibitions of the
16 genitals to the magistrate judge at the time.  So I think it's
17 wrong to fault Agent Kayle for not doing that in this case
18 under the law.
19      Because of the facts, it's also wrong.  Agent Kayle,
10:24AM 20 unlike the agent in Perkins, didn't have copies of those
21 images.  In fact, the copies resided at Best Buy.  This is an
22 unusual case in that these images were discovered by a private
23 party, and they were not discovered in the course of, as
24 happened in Perkins, a search of the border.  They were not
10:24AM 25 discovered, as has happened in other cases, via a peer-to-peer
```

investigation.  She never had copies of the images and was
forced to rely on the description that Agent Riley provided to
her.

As far as the descriptions that were provided in the
search warrant, those were absolutely accurate, Your Honor.
The description of the Jenny image was exactly the image that
we provided to the Court.  And to say that Agent Kayle was --
acted recklessly with respect to that image by not providing it
to the Court seems a little bit unfair given the circumstances
of the case and given that she described the image accurately.

THE COURT:  Well, that's where I guess I have a
disagreement with you.  The affidavit gives the clear
impression that the image is child pornography, and it's not
child pornography.

MR. BROWN:  But, Your Honor, if I walked into --

THE COURT:  So the description in the affidavit is
inadequate.  It is not child pornography.

MR. BROWN:  But the description of the image
describes the image itself.  The magistrate judge could make
that determination on his own.  And whether Agent Kayle called
it child pornography or not, whether there's a legal dispute
about that or not is sort of irrelevant because the facts that
would have allowed the magistrate independently to come to that
conclusion were accurately provided in the affidavit.

There are other things about *Perkins* that help distinguish

that case from the situation here.  In that case, the agent not
only failed to provide copies of the images, but the agent left
out key facts about how those images had come into his
possession and what the Canadian authorities in that case did
with the images.

The agent said that *Perkins* had been arrested by Canadian
authorities but left out the fact that they dropped the charges
because they deemed it, under Canadian law, that the images did
not constitute child pornography.

*Perkins* also in that case, the agent redescribed the
images suggesting that there was a focal point of the genitals
of one of the young women when, in fact, that was not the case.
And it was because of that that the Ninth Circuit ruled that
given the circumstances of this case, Agent Ensley was required
to provide copies of images.

*Perkins* doesn't say that in every case we have to provide
images to the magistrate judge.  And certainly under the
circumstances of *Perkins*, which -- none of which are present
here, *Perkins* can't be applied to the factual situation in this
case.  I don't think it lays down a clear, bright line rule
about when you have to do it.  I think it's a factual
determination.

And under the facts of this case, Agent Kayle simply
couldn't provide the images to the judge.  And she did the best
that she could.  She provided an accurate description of one of

1    the images.  She also described other images that displayed the

2    vaginas of young girls.  And that was enough to provide

3    probable cause.

4         THE COURT:  I read *Perkins* to say something a little

10:27AM 5    bit more indifferent.  I read *Perkins* to say if you're going

6    under the other grounds for child pornography, maybe the

7    detailed written description would be sufficient.  But if

8    you're going under the area for lascivious exhibition of

9    genitalia as the child pornography, then you have to give a

10:28AM 10   very good description of it that would satisfy that, but that

11   what you really should do is attach the image and so the

12   magistrate can do his or her own independent review.

13        But, Mr. Brown, I think it's important, that is, okay, the

14   second step of the *Franks* analysis, I have to then see, and I

10:28AM 15   was provided the image.  And, again, my finding is that image

16   is not child pornography.  It's not sadistic, and it's not

17   lascivious exhibition.

18        And so then I have to determine based on that as well as

19   the standard boilerplate is that sufficient for probable cause?

10:29AM 20   And I think *Perkins* and other Ninth Circuit authority says that

21   is not sufficient for probable cause.

22        MR. BROWN:  Did Your Honor -- is Your Honor making

23   the finding that the written description of the image in the

24   search warrant is inaccurate?

10:29AM 25        THE COURT:  I'm saying that it does not describe

**UNITED STATES DISTRICT COURT**

```
 1   child pornography.
 2               MR. BROWN:  I'm asking you --
 3               THE COURT:  It describes -- and then when I see the
 4   image, it's child erotica.  And I'm saying that the agent was
 5   not intentionally misleading, but she was recklessly so.
 6               MR. BROWN:  Well, I'm sorry, I may not have asked
 7   the question properly.  I'm asking a slightly different
 8   question.
 9               THE COURT:  Okay.
10               MR. BROWN:  If -- when you looked at the image, the
11   Jenny image --
12               THE COURT:  Yes.
13               MR. BROWN:  -- and compared it to the description of
14   the Jenny image that was in the search warrant --
15               THE COURT:  Right.
16               MR. BROWN:  -- did the description accurately
17   capture what was contained in that image?  And this is separate
18   and apart --
19               THE COURT:  I hear what you're saying.  It gave a
20   misleading description because the affidavit said it was child
21   pornography, and it's not.  And then it just gave the -- it
22   parroted what Agent Riley had said in the EC.  And, again, that
23   is not child pornography.  That description is insufficient.
24        So you keep just trying to say, "Hey, well, there's words,
25   the specific words describing the image, and that's accurate."
```

 1          And I'm saying, "Yeah, that's accurate, but that's

 2     incomplete because the affidavit clearly stated that it was

 3     child pornography."

 4          MR. BROWN:  But, Your Honor, that's a legal

10:31AM  5     conclusion.  That's an allegation that's being made by the --

 6     this happens in search warrants all the time.  We come in and

 7     we tell the judge we think this is probable cause, and the

 8     judge says, "No, I don't think so."  That's not reckless

 9     disregard on my part.

10:31AM 10          THE COURT:  I disagree.  It would be improper,

11     inappropriate for the magistrate judge to give a warrant for a

12     person's entire home based on child erotica.  The law is pretty

13     clear that child erotica by itself is not child pornography,

14     and it's not sufficient to search a person's home.

10:31AM 15          MR. BROWN:  Separate -- that's a separate question

16     from the one about whether the agent was reckless with respect

17     to the description of the image.  And I think -- I think the

18     Court is wrong.  If the agent accurately describes the image,

19     that cannot be by definition recklessness with regard to the

10:32AM 20     truth.  An accurate description of the image allows the

21     magistrate judge to make a determination.

22          THE COURT:  You keep trying to ignore the words that

23     it was child pornography.  And that was a conclusion that the

24     agent made.  And you keep trying to take that away and remove

10:32AM 25     it and ignore it from the description.  And I'm not willing to

**UNITED STATES DISTRICT COURT**

```
 1    do that.
 2              MR. BROWN:  Well, but couldn't the magistrate make
 3    that determination, or are you assuming the magistrate had to
 4    believe what the agent said?
10:32AM  5         THE COURT:  No.  I'm saying what the magistrate
 6    reasonably believed based on the wording of the affidavit
 7    saying it was child pornography and here's a -- what I will
 8    call an incomplete description of it.  What was said was
 9    accurate, but more had to be said.
10:32AM 10         MR. BROWN:  What more could have been said at that
11    point, Your Honor?
12              THE COURT:  It's merely child erotica.  It's an
13    image of child erotica.
14              MR. BROWN:  Your Honor, do you understand that I
10:33AM 15   also believe that's child pornography?  Am I being reckless in
16    presenting that case to the Court and arguing for that?
17              THE COURT:  Yes.
18              MR. BROWN:  I want to take a stab --
19              THE COURT:  I just don't think that's a
10:33AM 20   reasonable -- the Fourth Amendment is pretty powerful.  I
21    realize there are a lot of exceptions to it.  But it is a
22    pretty powerful principle of our country.  And if you're going
23    to search someone's home, you need to be accurate, and you need
24    to have a good faith reasoned informed belief on what you found
10:33AM 25   and what you're saying is probable cause.
```

1      And to me, representing to the magistrate judge that you

2  have child pornography is a very significant representation

3  that has meaning.  When a seasoned agent comes into my court

4  and tells me there is drug contraband here, that there is child

10:34AM 5  pornography here, I want to give that weight.  I have to give

6  that weight.

7      But if they're telling me something that's not true, i.e.,

8  that there isn't child pornography, it's just child erotica,

9  that has a major impact on my decision whether I'm going to

10:34AM 10  sign off on a warrant.

11          MR. BROWN:  I'm just not -- I guess I don't

12  understand what the Court expected Agent Kayle to do under the

13  circumstances of the case and to -- you know, given the fact

14  that the government was not in possession of these images, this

10:34AM 15  case is wholly different from *Perkins*.

16          THE COURT:  It should have got -- somehow, some way,

17  it should have got its hands on that image before it went into

18  court.  And what I would expect the agent to do is not say that

19  it's child pornography.  I would expect the agent to say that

10:35AM 20  this is all we got.  We have one image of child erotica that we

21  found on the unallocated space.

22      That's what I -- you asked me what do I expect the agent

23  to say?  I expect the agent to say, "We found one image of

24  child erotica on the unallocated space."

10:35AM 25      And any reasonable magistrate judge would say, "That ain't

```
 1   good enough.  You can't search his home."
 2            MR. BROWN:  I want to make an analogy here to the
 3   drug context.
 4            THE COURT:  All right.
 5            MR. BROWN:  All right.  There are numerous times
 6   when the government submits search warrants based upon
 7   conversations only, intercepted conversations, based upon
 8   surveillance and observations about what's occurring when the
 9   government does not have evidence that drug transactions have
10   been taking place, the government surmises that from the
11   circumstantial evidence.
12        What I mean is there are lots of times when we ask for
13   search warrants of people's homes not because we had a seizure
14   of methamphetamine or heroin or cocaine or something like that,
15   but because we see things that suggest that evidence of a crime
16   is going to -- is going to be found at that place, at that home
17   or that other location.
18        Even given the Court's ruling that this is not child
19   pornography, that it's child erotica, you still have on
20   somebody's computer multiple images of young girls' vaginas and
21   an image of a girl on her hands and knees naked with a choker
22   collar around her neck.  That's probable cause to believe that
23   there are going to be other images of child pornography on the
24   computer.
25            THE COURT:  Well, wait --
```

1      MR. BROWN:  There's a fair probability that if you

2  search that computer, you're going to find child pornography

3  there.

4      THE COURT:  If all you have is one image of child

10:37AM 5  erotica, I'm saying that isn't good enough --

6      MR. BROWN:  And the other images that were

7  described?

8      THE COURT:  -- you disagree with that.  The other --

9  I think *Perkins* makes clear that I should not be -- I cannot

10:37AM 10  consider that because you have to give a more accurate

11  meaningful description of those other images if they satisfy

12  any of the grounds of child pornography.

13      But *Perkins* itself, there was more than one image of child

14  erotica.  There was at least two, if not more, images.  And the

10:37AM 15  Ninth Circuit said that is not good enough for probable cause

16  under the second step of the *Franks* analysis.

17      So what you're basically telling me to do is I should

18  disregard not only Perkins but all those other cases that have

19  said child erotica is not enough to show probable cause that

10:38AM 20  there's child pornography.  In fact, whether you agree with it

21  or not, many of the cases suggest if all the individual is

22  looking at is child erotica, he or she is making a conscious

23  decision, I'm not going to go to that next level of looking at

24  child pornography.

10:38AM 25      MR. BROWN:  But the difference between the

**UNITED STATES DISTRICT COURT**

circumstances that you're describing in this case is that in
addition to a picture that shows a sexual interest in children,
there are also other pictures of young girls' genitalia.

THE COURT:  But I don't have -- I don't have a
sufficient description of that to determine whether it is child
pornography or not.  And, in fact, it sounds like you're going
under the category of lascivious exhibition of genitalia, and
*Perkins* says the state of the law is you really need to attach
the image or you need to see that image, and you haven't
presented me any other images other than the Jenny image.

I would even say academically, if you had said in the
affidavit that this Jenny image is child erotica but it is part
of a series of known child pornography or that this is a known
victim of child pornography, that might be enough to persuade
me.  Maybe not other judges, but it would be enough to persuade
me to sign off on the warrant.

But there was nothing in the electronic communication that
indicated this was part of a series of well-known child
pornography, nor did the affidavit say anything that this image
of child erotica was part of a video that is child pornography
and describe those other scenes, then I'd say that would be
good enough.

But, again, the *Franks* analysis that I need to do as
articulated through *Perkins* is I have to say, okay, I have to
correct the affidavit with what important information was left

```
 1  out.  I can't start trying to speculate or figure out, well,
 2  maybe there's other information that would be beneficial and I
 3  can -- that the government should have included.  It doesn't
 4  work that way.  I can only -- I can only consider what the
 5  government left out that hurt the defendant, not what the
 6  government left out that helps the defendant, if you follow me.
 7          MR. BROWN:  I do.  Here's one request that I would
 8  make, Your Honor.  I would like the Court, before it issues its
 9  final order, to go back through the Perkins case and look at it
10  again carefully in light of the arguments that I've made today
11  because we did not get a chance to brief it --
12          THE COURT:  I have it here.
13          MR. BROWN:  But --
14          THE COURT:  -- and I've looked -- I mean, I've
15  looked at it.  I've read it probably about five or six times.
16          MR. BROWN:  Well, we didn't -- we didn't get a
17  chance to brief it.  And I understand -- this is the point that
18  I'm ultimately trying to get to is the recklessness in Perkins
19  had to do with the fact that there was an agent who was told
20  that a case was dropped in Canada against Mr. Perkins, that the
21  law in Canada and the United States with respect to what
22  constitutes child pornography was more or less the same, and
23  they decided not to prosecute him in Canada.
24      That agent had the very images that were contested in his
25  hands and changed the description of the images in the search
```

10:40AM (line 5)
10:41AM (line 10)
10:41AM (line 15)
10:41AM (line 20)
10:42AM (line 25)

**UNITED STATES DISTRICT COURT**

warrant.  And the Ninth Circuit said that's reckless.  If you're going to start misrepresenting things to the Court, you know, under these circumstances, you got to attach the images.  If you have them in your hands, you got to attach the images.

And the reason it was reckless in that case was because the agent was misrepresenting not only the facts surrounding the criminal investigation that took place in Canada, but the very facts about the picture that made it -- allowed the Ninth Circuit to determine whether or not it was a lascivious display of the genitals.

This case is very different.  This is a case where Agent Riley was visiting a private corporation where that's where the images were being held.  She didn't seize the images.  And when, in fact, they tried to find the images later back at the FBI office, they were unable to access the images.

Agent Kayle never had copies of the images in her hand.  She wasn't being reckless.  She was relying on what Agent Riley described to her.  And what Agent Riley described actually is what the image looks like.  I understand that she led the Court to believe that it was child pornography because, in her opinion, it was child pornography.  In the government's opinion, that is child pornography.  But that's a reasonable difference about the law.  That's not recklessness with respect to the facts of the picture.

And why this is so important, because the -- if the Court

1    finds that there was a facial issue with the description and

2    that that wasn't child pornography, I can live with that, but

3    then I get to argue that Agent Kayle and the government acted

4    in good faith.  So if you disagree that it's child pornography,

10:43AM  5    fine, it's not child pornography on its face, but that doesn't

6    mean that Agent Kayle acted recklessly.

7         If you say she acted recklessly, which she didn't, then

8    the government can't argue good faith.  And I would like to

9    make a good-faith argument in this case.  I don't think that

10:44AM  10   anything Agent Kayle did was wrong.  She got a search warrant.

11   She relied on descriptions that were provided to her by the

12   person who actually saw them and then took those descriptions

13   and tried to give the best presentation of them that she could

14   to the judge.

10:44AM  15        The fact that she said it was child pornography was a

16   legal conclusion that the judge could have disregarded if he

17   wanted to.  But, I mean, she has AUSAs who are telling her that

18   they believe that it's child pornography as well.  That's not

19   recklessness, Your Honor, that's being a good agent, and that's

10:44AM  20   getting as much of the facts in front of the judge as possible.

21        If Agent Kayle had not described the image or had added

22   features to the image that suggested it was child pornography

23   in a way that the actual copy of the image belied, that would

24   be recklessness.  That would be what happened in *Perkins*.  But

10:44AM  25   that's not what happened in this case.

**UNITED STATES DISTRICT COURT**

1          And because it wasn't reckless, I think that gives the

2    government the opportunity to argue that we got the search

3    warrant in good faith.  I mean, we did what you're supposed to

4    do in this case.  We got the best facts that we could.  We

10:45AM 5    presented them to the magistrate, said, "It's your call."  We

6    got a search warrant for both the computer and for the house.

7    That's what you're supposed to do.

8          And in doing that, Agent Kayle didn't misrepresent any

9    facts.  She made a legal argument that the government endorsed

10:45AM 10   that this was child pornography.  That's not recklessness.

11             THE COURT:  Well, again, you kind of isolate aspects

12   of the affidavit instead of taking them together.  What I mean

13   specifically, Mr. Brown, is you failed to acknowledge that it

14   was represented to the magistrate judge that it was child

10:45AM 15   pornography.  You failed to acknowledge that it wasn't

16   disclosed to the magistrate judge that it was on unallocated

17   space.  And I realize this is a search warrant, it's not a

18   conviction, but that has evidentiary significance.  And it is

19   relevant to a probable cause.

10:46AM 20        And then Agent Kayle is responsible for everything

21   Agent Riley knows, and a magistrate judge would want to know

22   that there were three searches of the hard drive without a

23   warrant and one attempted search of the hard drive without a

24   warrant.  A magistrate judge would want to know that.  And it

10:46AM 25   is material because the affidavit itself says there were no

```
 1   other efforts or attempts to obtain child pornography, and that

 2   wasn't true.

 3        So when I take all of that together, I just don't see how

 4   a reasonable magistrate could say that's probable cause.

 5        MR. BROWN:  If Your Honor would indulge me for just

 6   another couple minutes on the last two issues about the other

 7   searches.

 8        Your Honor asserts that it's material to the decision

 9   about probable cause, but it's unclear -- and I think this is,

10   you know, from our argument.  The question is what relevance

11   does it have to a determination about whether there's a fair

12   probability that evidence would be found either on the computer

13   or at the house.  The fact that the agents attempted other

14   searches has no connection whatsoever to that question.

15        THE COURT:  No, it --

16        MR. BROWN:  It may be something that a magistrate

17   would want to know just out of fairness, but it has nothing to

18   do with the question of whether there was probable cause to

19   conduct these searches.

20        THE COURT:  No, it gives me the impression as the

21   magistrate judge that they only found one image of child

22   erotica, and yet they tried really darn hard to find other

23   stuff.  That's what gives me the impression.

24        Again, maybe we have a little bit of a disagreement is a

25   person's home is sacred to me.  And I'm not trying to get on my
```

**UNITED STATES DISTRICT COURT**

```
 1    high horse, but, you know, close is not good enough for me when
 2    you're asking to search someone's home.
 3            MR. BROWN:  Your Honor, if -- what the Court is
 4    supposed to do when it finds a reckless representation or
 5    omission in the search warrant is add the actual facts back
 6    into the search warrant.  And if the Court wants to do that
 7    with respect to the other searches, then what the Court has to
 8    now consider is the fact that there was a search that was
 9    attempted back at the FBI office on January 6; it was
10    unsuccessful because the data was underlined.  And then it has
11    to go back and look at the search that Agent Riley conducted on
12    February 3rd.  And she saw other images.  The Court has
13    evidence of the fact that those images certainly are child
14    pornography.
15            THE COURT:  I think that's a misstatement of the
16    law.  And if I'm wrong on that -- I think the law is pretty
17    clear, I cannot -- cannot go back and put in evidence that the
18    government should have put in --
19            MR. BROWN:  No, no --
20            THE COURT:  -- that is beneficial to the government
21    and hurtful to the defense.
22            MR. BROWN:  I'm saying if you believe there was an
23    omission, then the omission has to be corrected.
24            THE COURT:  Right.
25            MR. BROWN:  Okay.
```

1     THE COURT:  An omission, how you correct it, I

2 believe, under the analysis is there were three searches done

3 of the hard drive without a warrant, and there was one

4 attempted search of the hard drive without a warrant.

10:49AM 5     MR. BROWN:  Right.

6     THE COURT:  And I can walk you through those three.

7     MR. BROWN:  And none of those -- why would that be

8 relevant under the Court's first ruling, the Best Buy motion,

9 given that there was no expectation of privacy?  Wouldn't the

10:49AM 10 magistrate judge have come to the same conclusion as this Court

11 and said, "Well" --

12     THE COURT:  Arguably.  But the government obviously

13 thought there was an expectation of privacy.  And as a

14 magistrate judge, I would want to know, okay, did you search

10:50AM 15 and did you think there was some expectation of privacy?

16 Whether I agree with it or not, I would want to know that.

17 That's relevant.

18     But the point -- the more important point to me is in the

19 affidavits, it says it's important relevant information whether

10:50AM 20 we made other attempts, other searches to try to get this

21 information.  That is the important fact.  So my response to

22 you is it's material and it's important because you say it's

23 important and material.

24     MR. BROWN:  No.  The reason --

10:50AM 25     THE COURT:  In the affidavit I can quote you the

**UNITED STATES DISTRICT COURT**

1 language on what -- what you said.

2             MR. BROWN:  I know the language, and I know why it's

3 in there as well.  It's in there because of the CDT case.

4 That's why it's there.  It was something that was negotiated

10:51AM 5 between the magistrates and our office to comply with CDT when

6 CDT came down in 2010.  That's why it's there, to show that

7 we're not going to the District of Nevada to get one search

8 warrant, that one gets denied, and then we come back here to

9 the Central District and get another search warrant so that

10:51AM 10 we're not forum shopping.  And there's nothing like that that

11 happened in this case, Your Honor.

12       And, Your Honor, I know you have another hearing coming

13 up --

14             THE COURT:  That's all right.  This is important.

10:51AM 15             MR. BROWN:  It's the unallocated space issue, the

16 Court hasn't indicated any factual sort of -- any of the facts

17 that led the Court to the conclusion that Agent Kayle

18 recklessly failed to use the term "unallocated space" in the

19 search warrant.

10:51AM 20       As you know, the government has argued that Agent -- first

21 of all, that there's no evidence that the -- that the stuff was

22 in unallocated space in the sense that the defendant argues.

23             THE COURT:  I mean, there was, I think, a lot -- a

24 lot of evidence that Agent Kayle realized it was on unallocated

10:52AM 25 space, but the record will speak for itself.  But the one that

1  just jumps out at me is the one where she indicates to her

2  supervisor the U.S. Attorney is not going to charge on this.

3          MR. BROWN:  That's what convinced the Court?  I

4  thought it was fairly --

10:52AM 5          THE COURT:  That's one of the powerful facts.

6          MR. BROWN:  I'm actually astonished, Your Honor,

7  because of all of the facts in this case, that seemed to be the

8  one that got bludgeoned to death by both the testimony of

9  Agent Kayle and her supervisor who clearly testified that, "A,"

10:52AM 10  that was wrong; "B," that had nothing to do whatsoever with

11  Agent Kayle being concerned about getting a search warrant.

12  All it showed was that Agent Kayle thought maybe we would have

13  to take it to the state as opposed to a federal agency.

14          THE COURT:  Well, you know, the record is what it

10:52AM 15  is.  You find -- that's your interpretation of what was said,

16  but I found that quite significant, that you're just adopting

17  your version that it's an innocuous statement.  The defense,

18  they have a much different characterization of that statement,

19  and I, candidly, adopt their characterization of it, that it

10:53AM 20  was very significant that that was on unallocated space and

21  that was not disclosed to the magistrate judge, and it should

22  have been.  I'm not saying it was intentional deception on the

23  government's part, but it was reckless.

24          MR. BROWN:  It could not have been reckless if the

10:53AM 25  defendant's own expert couldn't tell the Court that it was in

**UNITED STATES DISTRICT COURT**

1   unallocated space.  She didn't know.  And she was the one who

2   examined the thing, and she had no idea where it was.

3          THE COURT:  We're arguing past one another now,

4   Mr. Brown.  It's the government, Agent Riley and Agent Kayle,

10:54AM 5   understood there was major significance, whether you believe it

6   or not, that they understood it was of significance and

7   importance whether the image was on unallocated space or

8   allocated space, and --

9          MR. BROWN:  And Agent Kayle described exactly the

10:54AM 10   significance of the material -- the whole point of the fact

11   that it was in unallocated space from the defendant's point of

12   view --

13          THE COURT:  It didn't describe it in the affidavit.

14   Described the significance in her e-mail communication with her

10:54AM 15   supervisor, appears to have described the significance before

16   the grand jury, but did not even disclose the fact that it was

17   on unallocated space to the magistrate judge.

18          MR. BROWN:  Right.  And as far as the grand jury

19   testimony goes, Your Honor is aware that there are different

10:55AM 20   ways of using the term "unallocated space."  It's a term of

21   art.  Sometimes it means inaccessible.  Sometimes it means

22   deleted in that section of the hard drive that it no longer has

23   the pointers from the file table.

24          THE COURT:  And I was using the version that

10:55AM 25   Agent Riley and Agent Kayle was using.

**UNITED STATES DISTRICT COURT**

1    MR. BROWN:  And that means inaccessible by normal

2    means; right?

3         THE COURT:  That means that it was on unallocated

4    space.  And you have a lot of problems determining when or if

10:55AM  5    the defendant, the suspect, the computer user looked at it, was

6    aware of it and deleted it, where you don't have those types of

7    problems, as I understand it, from a technology standpoint if

8    it's on allocated space.

9         MR. BROWN:  But not only was that --

10:55AM 10    THE COURT:  We're arguing over a point -- you're

11   saying this point doesn't matter.  Well, if it doesn't matter,

12   why did the agent and Agent Riley talk about it?  If I'm so far

13   out to lunch, why are they making a big deal of it?  Why are

14   they making an issue of it?

10:56AM 15    MR. BROWN:  Because it's an important fact to know

16   when you're going to do a forensic analysis on a computer, and

17   it's an important fact to know for charging a case.  It's

18   not such an important fact to know when you're seeking to prove

19   that there's probable cause that evidence will be found on a

10:56AM 20   computer or at the house.

21        THE COURT:  Okay.

22        MR. BROWN:  The government doesn't --

23        THE COURT:  That's your distinction.  That's fine.

24   I just disagree.

10:56AM 25        MR. BROWN:  No, but the point is that the Court is

**UNITED STATES DISTRICT COURT**

1      buying into the theory that we -- the government, at the time

2      it applied for the search warrant, had to show that the

3      defendant knew that the stuff was on his computer.  We don't

4      have to show that.

10:56AM 5          THE COURT:  I'm not saying that.  I'm not saying

6      that.  I'm saying what they had to disclose was that it was

7      found on unallocated space.  They knew it was on unallocated

8      space.  They had their understanding of what unallocated space

9      was, and they needed to share that with the magistrate, because

10:57AM 10     their own words, actions show that that has major significance.

11          And you're telling me, "Well, Judge, what they said, they

12     didn't mean it that way."  Well, I'm just interpreting what

13     they said in its ordinary plain meaning.  I'm not giving any

14     kind of special computer science definition to what they're

10:57AM 15     saying.  They're saying that, "Hey, they're not going to charge

16     if it's on unallocated space.  The U.S. Attorney is not going

17     to charge on it."

18          MR. BROWN:  Your Honor, let me just have a minute to

19     talk to counsel.

10:57AM 20          THE COURT:  Okay.

21          Mr. Miller, Mr. Riddet, do you have a rebuttal?  It's your

22     record, sir.  And my sense is that this is going to see other

23     eyes on appeal.  So I want to give you a chance to respond to

24     it.

10:58AM 25          MR. RIDDET:  I don't think so, Your Honor.  I think

**UNITED STATES DISTRICT COURT**

1    we're happy with the way it is now.  And unless Your Honor has

2    a question that you'd like us to address, I think the colloquy,

3    which we just witnessed, I don't think needs any further

4    comment from us.

10:58AM 5              THE COURT:  And I appreciate that, but am I --

6    again, because it's your record, so I know this must sound like

7    a self-serving question to you, but you have a very different

8    characterization of the factual evidence about whether it was

9    on unallocated space or not and the significance of it?

10:58AM 10        And I have interpreted your argument to say this is a very

11   significant fact, that the government realized that there are

12   problems getting a conviction and even convincing the U.S.

13   Attorney's Office to charge if it's on unallocated space.

14   And I -- that's how I interpreted your argument.  That's how I

10:59AM 15   interpreted that evidence.  Do you interpret it the way that I

16   am?  Is that what you intend to persuade me --

17             MR. RIDDET:  Yes.  And I think there's one thing

18   that Mr. Brown has not recalled.  In the evidentiary hearing,

19   when I was examining the affiant about this e-mail, which I

10:59AM 20   think does have tremendous significance when she says the

21   U.S. Attorney's Office won't charge on carved images, is the

22   way she put it, I think that is highly significant when you're

23   looking at whether she was intentional or reckless.

24        When I was cross-examining her about that, she also said

10:59AM 25   on her own, without me asking, and that would raise doubts in

her mind whether or not she could even get a warrant from the
U.S. Attorneys.  They may not charge.  They also might not even
approve a warrant.  She said that on her own.  It's right in
the transcript.  So that shows what's going on in her mind.

10:59AM          MR. BROWN:  But all of this is -- is completely
changed.  Whatever she believed at the time she sent that
e-mail, she didn't sign the search warrant or even draft the
search warrant until later after talking with the AUSA who
disabused her of that notion.

11:00AM          So it's -- to me, I find it very hard to understand how a
statement that Agent Kayle made weeks before she drafted and
submitted the affidavit somehow could make her reckless with
respect to information that she knew at the time was false,
that the U.S. Attorney's Office would seek a search warrant
11:00AM  even though we were going to have to carve for those images.
That's what she knew at the time that she was writing the
search warrant.

          And, Your Honor, I jus -- I want to say for the record
that I think that with respect to each of the things the Court
11:00AM  has identified here, the Jenny image, the omission of the fact
that the -- or the supposed fact that the child pornography
images were found in unallocated space, and the statement in
the search warrant that no other searches had been conducted, I
do not believe and -- my co-counsel and I do not believe that
11:01AM  the agent acted recklessly with respect to any of those

 1    statements.

 2        I think that the Jenny image is child pornography.  We can

 3    have a legal disagreement about that, but that doesn't make it

 4    reckless when the agent accurately describes what the image is.

 5        I think that the evidence that the Court is relying on to

 6    claim that Agent Kayle was reckless with respect to a

 7    representation about unallocated space just is belied by the

 8    facts of the case.  She may have been concerned about that

 9    three weeks before drafting the search warrant, but couldn't

10    have been concerned about it when the AUSA decided to take the

11    case.

12        She also disclosed the key facts in the case which were

13    that the information had to be carved, had to be recovered by

14    data recovery services.  That conveys the material information

15    that this defendant may not have had access to that data on his

16    computer.

17        That's the important thing about unallocated space.  Call

18    it whatever it is.  The important thing from the defendant's

19    point of view is that he couldn't have had access to it at his

20    house without specialized tools.  That was accurately conveyed

21    in the search warrant by the fact that the hard drive had to

22    have the data recovery services performed on it by specialized

23    tools at the Best Buy facility.

24        And as far as the other searches are concerned, I don't --

25    I agree that was a mistake, and we've conceded that from the

beginning.  I think that was not a reckless error, I think that

was an omission that was made under the circumstances of

drafting the search warrant.  That particular statement, as the

Court is aware, was changed by the AUSA during the revision

11:02AM  process.  I think Agent Kayle just overlooked it.

        But in any event, it couldn't have been --

            THE COURT:  -- on that point --

            MR. BROWN:  Yeah.

            THE COURT:  -- that's Agent Riley's bad, not

11:03AM  Agent Kayle.  Agent Kayle didn't know -- from what I could tell

from her, she didn't know about all those searches.

            MR. BROWN:  And then --

            THE COURT:  But the government's responsible for

Agent Riley as well.

11:03AM              MR. BROWN:  I understand that.

            THE COURT:  Agent Riley knew it because she did it.

            MR. BROWN:  But it is important to allocate the

blame where the blame goes for different agents in their

careers.  And so I think it's important that, you know, the

11:03AM  Court has clarified that.  Thank you.

        But with respect to the last issue as well, I just don't

understand how the Court can claim that that was a material

statement in the search warrant in light of the ruling that the

Court made on the Best Buy motion.  If there's no expectation

11:03AM  of privacy, it can't be material.  So I'm not sure where we go.

```
 1    But --

 2              THE COURT:  I guess, a lot of different reasons, but

 3    first and foremost is it shows that after all these searches,

 4    this is all they found?  That has material significance to

 5    me --

 6              MR. BROWN:  Well --

 7              THE COURT:  -- if I'm the magistrate judge to

 8    determine whether I'm going to sign off on a search of a

 9    person's entire home.

10              MR. BROWN:  I'm not sure that that's a fair way to

11    represent it because the Court knows that that's not all we

12    found.  And so --

13              THE COURT:  But that's -- I know.  But you know the

14    analysis that I have to do under the second step of the Franks

15    is, okay, I have to correct the affidavit.  I can't put in

16    things that the government left out that would be favorable to

17    the government and hurtful to the defense.  I can only in the

18    corrected affidavit put in what the government left out that

19    would be helpful to the defense.

20              MR. BROWN:  I'm not -- I don't know what case says

21    that, but --

22              THE COURT:  Just look at the way the analysis is

23    done.

24              MR. BROWN:  So I just wanted to make it clear for

25    the record, Your Honor, you know, from the government's point
```

11:05AM 

of view, the charges of recklessness against Kayle, I think,
are not supported by the record.  And we believe that the Jenny
images, child pornography, and that Agent Kayle accurately
described what she could have known at the time about the
location of those files on the defendant's hard drive.  Thank
you, Your Honor.

THE COURT:  All right.  I appreciate your argument.

MR. MILLER:  Your Honor, I just want to make sure
Your Honor is clear from our perspective, we've addressed every
single one of those points in our brief, in our reply brief.
If the Court would like us to go back over them now as he's
raising them, I'm happy to do it; however, we agree with the
Court.  We think the Court read the briefs and is getting it
right.  And so we're not intending to back off at any point.
But I can address any point the Court would like right now.  I
just don't see the need at this point.

THE COURT:  Well, I would like you to consult with
Mr. Riddet, just take a moment.  And just for the record, if
you could just summarize your response to that.  I think it
would be helpful for the record because Mr. Brown and I butted
heads in a respectful disagreement on these points that I
found, that the affidavit had false and misleading information
or there was important information that was left out and my
finding that it was reckless.

And the information that I focused on is, one, the Jenny

image; two, the fact that the image was found on unallocated

space; and, three, that there were three searches done without

a warrant and one attempted search without a warrant.  And I

think that information was important and the magistrate judge

11:06AM 5  should have been told it, and had the magistrate judge been

told it and with the corrected affidavit, there isn't probable

cause.

          And I apologize if I'm rambling a bit, but, Mr. Brown, you

know, I sensed he is critical of my analysis on whether there

11:07AM 10 is probable cause.  And his last point I thought was

significant is when I do the second step of the *Franks*

analysis, Mr. Miller, I believe the law is clear that I have to

look at the information the government left out that is

obviously favorable to the defendant.  But when I go through

11:07AM 15 that exercise, I didn't believe that I am entitled to start

searching the record or asking for the record to be

supplemented, give me information that would be helpful to a

finding of probable cause.

          Specifically, when I'm doing the corrected affidavit, if I

11:08AM 20 am aware or if it's in the record that Jenny is a well-known

child pornography video, and although the government in the

affidavit only focused on the one image, which is child

erotica, had the government said, "Well, we have one still that

we found and -- but this still is part of a very disturbing

11:08AM 25 child pornography video," and if you told the magistrate judge,

1    "Okay, it's one image, but it's an image that's part of a very

2    disturbing series that's well-known child pornography, and

3    we'll describe the other contents of the video," so a

4    magistrate judge could say, "Well, you know, I know this image

11:09AM   5    alone isn't sufficient for probable cause, but this image is

6    part of a series of a video, and there is a fair probability,

7    if you have one image of a video, then you might have other

8    images of the video, which we know is child pornography."

9        Please tell me if I'm not being clear, but I don't think I

11:09AM  10    can do that analysis.  I don't believe the law says when I'm

11    doing the *Franks* analysis I can start searching the record to

12    say, "Hey, government, you should have said this.  And if you

13    said this, it would have supported probable cause, even though

14    that's an undeniable fact that this image is part of a very

11:10AM  15    troubling well-known child pornographic video."  Are you with

16    me?

17              MR. MILLER:  Yes, Your Honor.

18              MR. RIDDET:  We're with you.  Thank you, Your Honor.

19              MR. MILLER:  Your Honor, we completely agree with

11:10AM  20    that.  And you got to remember that the reason that we're at

21    this stage of the analysis is because there's false statements

22    in the affidavit.  The government has made reckless omissions

23    and false statements in it, so that's when the corrections

24    start applying.  And the government is not entitled to have you

11:10AM  25    go back and say, "Well, they could have added this in, and they

1    could have added that in."  That undermines the purpose of the

2    warrant, and it's inconsistent with the procedural process of

3    where we're at, which is a problematic warrant in the first

4    place or a problematic search warrant affidavit.

11:10AM  5         But if I could just start back and go to the Jenny image.

6    The Jenny image description is patently misleading, as the

7    Court said, because it described it as child porn.  There's no

8    way that the magistrate can make an accurate decision on

9    whether this is child porn or not with a very general

11:11AM 10   description and the conclusion that it's child porn, No. 1.

11   And I think -- and I put in the reply brief that is -- that is

12   deceitful.  That is misrepresenting the image.

13        But even the description was wrong because it suggested

14   that it disclosed genitalia, and you wouldn't know that it

11:11AM 15   didn't disclose genitalia unless you actually looked at the

16   image.  But the wording in the search warrant affidavit

17   strongly suggested that this was an example of an image

18   depicting genitalia.  It was -- it was false in that way also.

19        As far as unallocated space go, I think the government's

11:11AM 20   making up the distinction between strict or narrow unallocated

21   space and broad unallocated space.  Our expert simply said if

22   it's deleted, it's deleted.  I put in the reply brief we looked

23   for case law that talked about this different types of

24   unallocated space and found none.

11:12AM 25        Unallocated space is a thing, and it's a governing thing

in the Ninth Circuit when you have got *United States vs. Flyer*
and all of the cases out there, including the Supreme Court
case in *Jacobson*, that say cases that discuss what is
sufficient for a conviction can be relevant to probable cause.
It's just part and parcel of the legal framework under which
probable cause has to be determined.

On the question of no other images, I don't believe there
is any evidence of other images, certainly not under *Perkins*,
that are sufficient to justify a search warrant affidavit.  But
I think that the evidence is absolutely uncredible that there
were other images, because Agent Riley first says -- when
contacted by an agent so that she's going to have to meet with
Agent Scally, she says, "I don't know about any other images."
And then she meets with Agent Scally and says, "Well, maybe
they were cut and pasted from another -- another search warrant
affidavit."

And then when she's looking at her own notes, she says,
"Oh, those were from January 6."  It's -- it's really, really
hard to see that she saw anything, other than potentially on
February 3rd, which was an illegal search and which cannot be
used as -- to support probable cause.

So even if the Court could rely on the images, even though
they're so vague that the Court can't rely on them under
*Perkins*, the Court still couldn't because they would be the
fruit of an illegal search.

1    The suggestion that data recovery somehow explains what's

2    going on here, it simply doesn't.  We explained in our brief

3    that data recovery can be from allocated space and unallocated

4    space so it doesn't further the ball at all.

11:13AM  5    So I think that the Court has got it right.  I think that

6    Mr. Brown gave a very long and impassioned speech for his view

7    of the evidence; we just disagree.  And thank you, Your Honor.

8    THE COURT:  Appreciate it.

9    I'm going to go ahead and make my tentative the final

11:14AM 10   orders of the Court.  As I understand it, that means, then, the

11   evidence on the hard drive is in.  The evidence seized from the

12   house is out.

13   And I know we have a June 6 trial date, and I can go to

14   trial that date, I booked the time for it, but I understand

11:14AM 15   that that might be a problem for the parties, especially you

16   were waiting for this ruling.  I do have -- I can get you in if

17   you'd be ready in July, the last two weeks of July.

18   But, candidly, I'm out the rest of the year.  I have a

19   very complex trial, criminal trial that I have to go to

11:15AM 20   Los Angeles for.  I don't know if counsel are familiar with it,

21   it's the one dealing with the smash-and-grab robberies of

22   jewelry stores all around Southern California, and I think

23   there's approximately nine robberies, and eight of them are in

24   Los Angeles County, several in the San Fernando Valley.  Many

11:15AM 25   of them are armed.

**UNITED STATES DISTRICT COURT**

1          So all the witnesses, victims are in Los Angeles.  The

2     defendants, they're all from South Central L.A., supposedly

3     gang affiliation with the Crips.  And at every hearing, doesn't

4     matter how trivial the hearing is, it's usually a packed

11:15AM  5     courtroom with family members, so it doesn't make sense for all

6     those people to come to Orange County, so I'm going to L.A.

7     And it's anticipated to be an eight- to nine-week trial.

8          And then after that I have a case dealing with the

9     contamination of Orange County's groundwater, and that's going

11:16AM 10     to be a ten-week trial.  And I don't want to bore you with the

11     details, but it was an MDL case for a while and then came back.

12     And the parties are very anxious to have their trial.  It's

13     been out there for four or five years already.  I really have

14     to go forward with it.  It's a civil case, but it's a very

11:16AM 15     important civil case.  And with the procedural history,

16     hopefully you can understand I have to be here for that.

17          So that takes me out August through the end of the year on

18     those two cases alone.  I have other criminal cases, I don't

19     know how I'm going to handle them.  I might have to transfer

11:17AM 20     them to Judge Real or Judge Carter, but I can't give you the --

21     any other time.  I can give you June, I can give you July, or

22     it's going to have to be next year.

23               MR. RIDDET:  May we consult for a moment?

24               **(Counsel conferred off the record.)**

11:18AM 25               MR. RIDDET:  I think, Your Honor -- sorry.

**UNITED STATES DISTRICT COURT**

1          **(Counsel conferred off the record.)**

2          MR. RIDDET:  I think, Your Honor -- we had talked to

3   your courtroom deputy about dates.  I think there are some

4   things that we need to sort out and decide how we're going to

11:18AM 5   proceed.  And so current date is unrealistic, July is as well.

6   We'd take a date in the first couple months of 2018.

7          THE COURT:  Okay.

8          MR. RIDDET:  And then we're going to -- before then,

9   well before then, we'll probably have a decision on whether

11:18AM 10   we're going to go to trial or not.

11          THE COURT:  Okay.

12          MR. RIDDET:  And hopefully it will be not, but that's

13   something that the parties have to discuss.

14          THE COURT:  Okay.  Well --

11:18AM 15          MR. RIDDET:  Any day in -- any day in January,

16   February of 2018 is good for me.

17          THE COURT:  I think what I feel most comfortable

18   with, if this is acceptable to counsel, is why don't you meet

19   and confer and submit a stipulation and proposed order.  You

11:19AM 20   now know what my availability is.  And do it with what works

21   and makes sense to you, and then I will sign off on it.

22          MR. RIDDET:  We'll do that.  May I have one second

23   with Mr. Miller?

24          **(Counsel conferred off the record.)**

11:19AM 25          MR. RIDDET:  We will meet and confer.

**UNITED STATES DISTRICT COURT**

1       There is one request I would make of Your Honor.  As you

2   know, the hard drive, the one that came from Best Buy, is in

3   the government's possession.  I think there may be an argument

4   that they should not be allowed to search it any additional

11:20AM 5   without getting a warrant.  I don't know that I'm right about

6   that or not.  Mr. Miller and I have discussed it.

7       Because of that, Your Honor, I would ask Your Honor to

8   issue an order now that there be no further searches of that

9   hard drive until the parties have an opportunity to brief that

11:20AM 10   issue and advise Your Honor on whether or not they have the

11   right to search it any further without a warrant or whether

12   they have to get a warrant.  And because of that, I would ask

13   Your Honor to make that order.

14           THE COURT:  Mr. Brown, what's your response to their

11:20AM 15   request?

16           MR. BROWN:  I'm not sure what authority Mr. Riddet

17   is relying on for that.  We searched the computer already.

18   We're allowed to access anything that we bookmarked.  We

19   probably would up getting a second search warrant anyway to be

11:21AM 20   honest with the Court just to make sure there are no issues

21   that arise.

22           MR. RIDDET:  Well, if they're admitting -- if

23   they're stating in open court that they won't do any additional

24   searches until they get a warrant, I'm comfortable with that.

11:21AM 25   And maybe we can make that part of the order that we agree on

1    when we meet and confer.

2           MR. BROWN:  I'm not going to agree to that at the

3    moment, but I'm just telling the Court that my inclination is

4    to go get a second warrant so that there are no issues at all.

11:21AM 5           MR. RIDDET:  Then if they're not --

6           THE COURT:  Why don't you just see if you can reach

7    an agreement on it.  If you can't, you can't.  But, you know, I

8    had two parts to my ruling this morning, and one of them was

9    there was no expectation of privacy on the hard drive.  So to

11:21AM 10   be consistent, I don't -- I'm not sure I can -- unilaterally I

11   feel comfortable granting your order, although I know you

12   respectfully disagree that -- I think Mr. Miller says that

13   Dr. Rettenmaier did have an expectation of privacy,

14   specifically that it wouldn't be turned over to the government

11:21AM 15   and the FBI.  But that's not my ruling.

16       So -- but if -- I'm always encouraged -- if the parties

17   can agree on handling of evidence and the issues, great.

18   That's wonderful.  If you can reach an agreement, you know,

19   make it part of the stipulation and proposed order.

11:22AM 20          MR. RIDDET:  Well, you're right.  We do respectfully

21   disagree with your analysis on the hard drive, primarily

22   because we believe that although he was allowing Best Buy to do

23   a data recovery, he was not consenting to a government search.

24   And I don't think there's any question in the record that the

11:22AM 25   searches by Meade were government searches.  He did not consent

```
 1   to that, nor did he waive his appreciation of privacy for that.
 2   So we disagree on that, Your Honor, and that's our position.
 3              THE COURT:  Okay.
 4              MR. RIDDET:  All right.  Thank you, Your Honor.
 5              THE COURT:  I'll look forward -- can you get me the
 6   proposed stipulation order in about a week?
 7              MR. RIDDET:  Sure.
 8              MR. BROWN:  Of course.
 9              THE COURT:  Okay.  Thank you.
10              THE COURTROOM DEPUTY:  All rise.
11              (Proceedings concluded at 11:23 a.m.)
12                          --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  May 18, 2017*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN_*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**